UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————— X

KIM MORTIMER,

                              Plaintiff,                    INDEX:  **20 cv 8192**

                    -against-

SCOTT GRODSKY,                                              **COMPLAINT**
2386 HEMPSTEAD INCORPORATED,                               Violation of
JAMES KOCORIS ESQ., MOBERG AND KOCORIS                    18 U.S.C §§ 1028A, 1343, 1349, 2,
P.C., GENERAL ABSTRACT & SETTLEMENT
SERVICES, JAY WALDHAUSER, NASIR &                          COUNTY OF OFFENSE:
WALDHAUSER, ROBERT WINDFIELD, ASAP                        NEW YORK
CONSULTING,
ANATASIA KOULOURIS
ABSOLUTE HOME MORTGAGE CORPORATION                        **Jury Trial Demanded**
DONNA SCHOFFER
INTERCOASTAL ABSTRACT COMPANY, INTRA
COASTAL ABTRACT COMPANY INC., TRI
COSTAL ABSTRACT, BILL WILSON aka WILLIAM
E WILSON, MARIA TERASCO,
ALIYA J. NELSON ESQ.
HEIDI J SORVINO ESQ.
WILLIAM "VAN" HORNEFF
ELIZABETH HORNEFF
JOHN HORNEFF
ZEICHNER ELLMAN & KRAUSE LLP
MARK SCHLUSSEL
THOMAS KLEINBERGER
WHITE AND WILLIAMS LLP
WOLINSKY LAW GROUP PC
JOHN DOE 1 LOCKSMITH

RECEIVED
SDNY PRO SE OFFICE
2020 SEP 30  AM 10: 31

JOHN DOE 2-5

                          Defendants,                    :

------------------------------------------------------------

I, Kim Mortimer, hereby declare:

1.      I am the Plaintiff in this matter.

2.      I have complete knowledge of the facts of this case and submit this Complaint and Affidavit

in support of my complaint against the above referenced Defendants for violations of Violation

of Title 18, United States Code, §1343 §§ 1028A, 1349, and 2.

3.      Defendants violated several sections of the New York Statutory Business Practices Law

particularly § 349 - specifically Plaintiff's right to Fair Business Trade Practices.

4.      Defendants violated NYC Consumer Protection Law Section § 20-700 against Plaintiff.

5.      Defendants engaged in a "Fraud for Profit" scheme which financially injured Plaintiff by

defrauding her of at least five hundred thousand ($500,000) dollars;

6.      Defendants in perpetrating this scheme also denied Plaintiff of her substantive and

procedural due process rights under the U.S. Constitution

## OVERVIEW OF THE FRAUD FOR PROFIT SCHEME BY DEFENDANTS

7.      In brief this complaint is about unfair business practices committed via a *"Fraud for Profit"*

Scheme.

8.      This "Fraud for Profit scheme was committed by real estate industry insiders either

collectively or individually, who used their specialized knowledge and authority to misuse the mortgage lending process and the judicial system, to commit, facilitate and defraud the Plaintiff of no less than five-hundred-thousand dollars ($500,000).

9.      This complicated scheme involved the collusion by industry insiders, (the Defendants), which included bank officers, private lenders, appraisers, mortgage services, mortgage brokers, attorneys, loan originators, referees, mortgage closers, abstract companies and title companies, and upon information and belief, a Court Appointed Trustee and her Counsel.

10.     From 2014 up to and including 2020, in the Southern District of New York and elsewhere, Defendants, willfully and knowingly, devised and intending to devise a scheme and artifice to defraud, and for obtaining money or property by means of false and fraudulent pretenses.

11.     Defendants made representations, and promises to Plaintiff and attempting to do so, did transmit and cause to be transmitted by means of wire, radio, and television, communication in interstate and foreign commerce, writings, signs, signals pictures and sounds for the purpose of executing such scheme and artifice, to with Defendants through the use of interstate emails, amongst other means made materially false and deceptive representations to Plaintiff.

12.     Plaintiff used the materially false and deceptive representations of the Defendant to guarantee a commercial mortgage of her property.

13.     These false and deceptive actions included, but are not limited to, self-enrichment, identity fraud, abuse of power, false and inaccurate closing documents, false  accounting conflicts of interests, baiting and switching closing documents, undisclosed collusive relationships, undisclosed dual agency relationships, were all conducted to gain control of Plaintiff's property to ultimately short-sell it either via foreclosure and sale and/or bankruptcy proceedings.

14. In the Southern District of New York and elsewhere, the defendants, and others known and

unknown, knowingly and willfully did combine, confederate and agreed together and with each other to commit an offense against the Plaintiff, to wit, to violate Title 18, United States Code, section 1343.

15. It was a part and an object of the conspiracy that the Defendants, and others known and unknown, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, unlawful actions, representations, and promises, and attempting to do so would and did transmit and cause to be transmitted by means of writings, wire, radio, wire, television, communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds for purpose of executing such scheme and artifice in violation of Title 18, United States Code, §1343.

16. From at least in or about 2014, and up to and including on or about 2020, in the Southern District of New York and elsewhere, Defendants, known and unknown, knowingly and willfully did combine, conspire, confederate and agree together and with each other to commit an offense against the Plaintiff, to wit, to violate Title 18, United States Code, Section 1343.

## APPLICABLE LAW
## FRAUDULENT INDUCEMENT

17.    "Fraudulent inducement may be based on oral statements.  See, *Danann Realty Corp. v. Harris,* 5 NY2d 317, 320 [1959] ("Where the complaint states a cause of action for fraud, the parole evidence rule is not a bar to showing the fraud either in the inducement or in the execution despite an omnibus statement that the written instrument embodies the whole agreement, or that no representation have been made.")."

## CONSTITUTIONAL RIGHTS
## DUE PROCESS

4

18.     "Rights, constitutional and otherwise, do not exist in a vacuum.  Their purpose is to

protect persons from injuries to particular interest, and their contours are shapes by the interest

they protect" *Carey v. Piphus 435 U.S. 247, 254 (1978)*.   One "must be considered with

reference to the nature of the interests protected by the particular constitutional right in question"

and accordingly, "the elements and prerequisites for damages appropriate to compensate injuries

caused by the deprivation of one constitutional right are not necessarily appropriate to

compensate injuries caused by the deprivation of another" Id. at 264-265.

19.     Because the right to procedural due process is 'absolute" in the sense that it does not

depend upon the merits of a claimant's substantive assertions, and because of the importance to

organize society that procedural due process be observed…the denial of procedural due process

is actionable for damages without proof of actual injury. *Carey, 435 U.S. at 266-67*.   Actual

damages for procedural due process violation "are based on the compensation for injuries that

resulted from the plaintiff receipt of deficient process." *Warren, 823 F.3d at 143 (citing*

Poventud v. City of N.Y., 750 F.3d 121, 135-136 (2d Cir. 2014) (en banc).

## GENERAL BUSINESS LAW § 349

20.     "The typical violation contemplated by the statute involves an individual consumer who

falls victim to misrepresentations made another usually by way of false and misleading

advertising." *Genesco Entm't v. Koch*, 593 F. Supp. 743 (S.D.N.Y 1984). A Plaintiff alleging a

violation of GBL § 349 must prove it was misleading in a material way; and the plaintiff suffered

injury as a result of the deceptive act. *Oswego Laborers' Local 214 Pension Fund v. Marine*

*Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995).  "Whether a representation or an omission, the

deceptive practice must be 'likely to mislead a reasonable person acting reasonably under the

circumstances." *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29 (2000). Courts consider whether

an act is deceptive objectively. *Boule v. Hutton*, 328 F.3d 84, 94 (2d Cir. 2003). Notably, the

deceptive practice does not have to rise to "the level of common-law fraud to be actionable under

section 349." *Id.*, citing *Gaidon v. Guardian Life Ins. Co.*, 94 N.Y.2d 330, 343 (1999). In

addition, a plaintiff must prove "actual" injury to recover under the statute, though not

necessarily pecuniary harm. *Stuntman*, 95 N.Y.2d at 29; *Oswego Laborers'*, 85 N.Y.2d at 26.

And, the plaintiff must prove the deceptive act caused the injury. *Id.*; *Oswego Laborers'*, 85

N.Y.2d at 26.

## NEW YORK CITY'S CONSUMER PROTECTION LAW

21.      Under § 20-700 no person shall engage in any deceptive or unconscionable trade practice

in the sale, lease, rental or loan or in the offering for sale, lease, rental, or loan of any consumer

goods or services, or in the collection of consumer debts. This includes any deceptive trade

practice. Any false, falsely disparaging, or misleading oral or written statement, visual

description or other representation of any kind made in connection with the sale, lease, rental or

loan or in connection with the offering for sale, lease, rental, or loan of consumer goods or

services, or in the extension of consumer credit or in the collection of consumer debts, which has

the capacity, tendency or effect of deceiving or misleading consumers. Deceptive trade practices

include but are not limited to: (1) representations that goods or services have sponsorship,

approval, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not

have; the supplier has a sponsorship, approval, status, affiliation, or connection that he or she

does not have; goods are original or new if they are deteriorated, altered, reconditioned,

reclaimed, or secondhand; or, goods or services are of a particular standard, quality, grade, style

or model, if they are of another; (2) the use, in any oral or written representation, of

exaggeration, innuendo or ambiguity as to a material fact or failure to state a material fact if such use deceives or tends to deceive; (3) disparaging the goods, services, or business of another by false or misleading representations of material facts.

## JURISDICTION AND VENUE

22. The Court's jurisdiction is predicated upon 28 U.S.C. §§ 1331, 1343. 18 U.S.C §§ 1343, 1349, 2. This action is brought pursuant to 42 U.S.C.§§ 1983, 1985, and 1988, and the Fourth, Fifth and Fourteenth Amendments of the United States Constitution.

23. Venue is proper in the Southern District of New York under 28 U.S.C. §§ 1391 (b)-(c).

24. Under 28 U.S.C section 1367, a district court "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy [.]" 28 U.S.C. Section 1367 (a); *see United Mine workers of Am. V. Gibbs, 383 U.S. 715, 725 (1966).*

25. Where state and federal claims form part of the same controversy, as they do here, the Second Circuit has found that supplemental jurisdiction is properly exercised over the state-law claims. *Shahriar v. Smith & Wollensky Rest. Grp., In., 659 F.3d 234, 245-246 (2d Cir. 2011).*

## JURY DEMAND

26. Plaintiff respectfully demand a trial by jury of all issues in the matter pursuant to Federal Rule of Civil Procedure (FRCP") 38.

## PARTIES

27. At all times relevant, unless otherwise indicated:

28. Kim Mortimer is a resident of the State of New York and is named as the Plaintiff in this Complaint.

29. The Plaintiff was and is the sole shareholder and President of 60 91ST Street Corporation.

30. Plaintiff Mortimer owns 100% of the shares in 6091st Street Corporation.

31. Plaintiff Mortimer unconditionally guaranteed payment of the mortgagor's obligation to the Lenders in 2014, 2015, 2016

32. At all times relevant Scott Grodsky ("Defendant Grodsky") was a resident of Long Island, New York and was the President of 2386 Hempstead Inc. and Empire Solutions Inc.

33. Upon information and belief Defendant Grodsky is also Defendant William "Van" Horneff. (See Exhibit 1 closing disbursement statement stating mortgage is the same lender)

34. At all times relevant Defendant Grodsky was and is President of 2386 Hempstead Inc and Empire Solutions with principal addresses being

35. At all times relevant hereto, Defendant Grodsky committed the fraud for profit scheme against Plaintiff.

36. At all times relevant 2386 Hempstead Inc. was believed to be a domestic corporation, limited liability company, not-for-profit corporation, domestic partnership, proprietorship (or other domestic business entity).

37. At all times relevant hereto, Defendant 2386 Hempstead Inc. was not authorized to conduct business in New York in 2014 or 2015, but was conducting the business of lending money, in the State of New York, maintaining offices within the State of New York, at 2386 Hempstead Turnpike East Meadow, New York 11554 and 45 Glen Cove Road Greenvale New York 11548.

38. At all times relevant hereto, Defendant 2386 Hempstead Inc. duly existed as a "hard-money private" lender for the purposes of lending money to private individuals whos' property is financially distressed and in need of a loan.

39. At all times relevant hereto, Defendant 2386 Hempstead Inc committed the "Fraud for Profit scheme committed against Plaintiff.

40. At all times relevant hereto, Defendant Moberg and Kocoris LLC was authorized to do business, and was in fact doing business, in the State of New York, maintaining offices within the State of New York, for example at 150 Broadhollow Road Ste 320 Melville, New York 11747.

41. At all times relevant hereto, Defendant Kocoris duly existed as a Counsel to Defendants Grodsky, Windfield, 2386 Hempstead Inc. and ASAP Consulting for the purposes of providing legal counsel and services organized and existing under and by virtue of the laws of the State of New York.

42. At all times relevant James Kocoris Esq. ("Defendant Kocoris"), of Moberg and Kocoris LLC, was a Partner and Principal of Moberg and Kocoris LLC.

43. Defendants Kocoris was a co-conspirator in the "Fraud for Profit" lending scheme committed against Plaintiff.

44. At all times relevant Moberg and Kocoris LLC, a domestic corporation, limited liability company, not-for-profit corporation, domestic partnership, proprietorship (or other domestic business entity), organized and existing pursuant to, and by virtue of, the laws of the State of New York.

45. At all times relevant Moberg and Kocoris LLC was a co-conspirator in the Fraud for Profit lending scheme committed against Plaintiff.

46. At all times relevant Defendant General Abstract & Settlement Services a domestic corporation, limited liability company, not-for-profit corporation, domestic partnership, proprietorship (or other domestic business entity), organized and existing pursuant to, and by virtue of, the laws of the State of New York

9

47. At all times relevant hereto, Defendant General Abstract & Settlement Services was authorized to do business, and was in fact doing business, in the State of New York, maintaining offices within the State of New York, with offices located at 150 Broadhollow Road Ste 320 Melville, New York 11747.

48. At all times relevant hereto, Defendant General Abstract & Settlement Services duly existed as an abstract and settlement company for the purposes of providing property abstract and settlement services organized and existing under and by virtue of the laws of the State of New York.

49. At all times relevant hereto, Defendant General Abstract & Settlement Services was a co-conspirator in this "Fraud for Profit" Scheme committed against Plaintiff.

50. At all times relevant Jay Waldhauser Esq. ("Defendant Waldhauser"), was a Partner and Principal of Nisar & Waldhauser.

51. At all times relevant Nisar & Waldhauser P.C., was and is a domestic corporation, limited liability company, not-for-profit corporation, domestic partnership, proprietorship (or other domestic business entity), organized and existing pursuant to, and by virtue of, the laws of the State of New York.

52. At all times relevant hereto, Defendant Waldhauser was authorized to do business, and was in fact doing business, in the State of New York, maintaining offices within the State of New York, with offices located at 55 Old Country Road. Hicksville New York 11801.

53. At all times relevant hereto, Defendant Waldhauser duly acted as Plaintiff's counsel in 2015 for the purposes of reviewing closing documents in 2015 and organized and existing under and by virtue of the laws of the State of New York.

54. At all times relevant to this information, Defendant Waldhauser Esq. was a co-conspirator in the "Fraud for Profit" lending scheme committed against Plaintiff.

55. At all times relevant hereto, Defendant Robert Windfield, ("Defendant Windfield") was and is the owner and Principal of ASAP Consulting Inc and partner to Defendant Grodsky, and Principal of Defendant 2386 Hempstead Inc.

56. At all times relevant Defendant Windfield, was a co-conspirator was a co-conspirator in the Fraud for Profit lending scheme committed against Plaintiff.

57. At all times relevant ASAP Consulting Inc.  ("Defendant ASAP") a domestic corporation, limited liability company, not-for-profit corporation, domestic partnership, proprietorship (or other domestic business entity), organized and existing pursuant to, and by virtue of, the laws of the State of New York.

58. At all times relevant hereto, Defendant ASAP was authorized to do business, and in fact doing business, in the State of New York, maintaining offices within the State of New York, located at 72 Anderson Ave North Babylon, New York 11703.

59. At all times relevant hereto, Defendant ASAP duly existed as a Broker and Hard-Money Lender for the purposes of finding lenders and lending money duly organized and existing under and by virtue of the laws of the State of New York.

60. At all times relevant Defendant ASAP Consulting was a co-conspirator in the Fraud for Profit lending scheme committed against Plaintiff.

61. At all times relevant Anatasia Koulouris (Defendant Koulouris) was a Principal of ASAP consulting maintaining a residence and office within the State of New York, located at 72 Anderson Ave North Babylon, New York 11703.

62. At all times relevant Defendant Koulouris was a co-conspirator in the Fraud for Profit lending scheme committed against Plaintiff.

63. Defendant Koulouris was also an employee of Defendant Absolute Home Mortgage Loans Corporation ("Defendant Absolute Home Mortgage Corporation Loans").

64. At all times relevant hereto, Defendant Absolute Home Mortgage Corporation, was authorized to do business, and was in fact doing business, in the State of New Jersey maintaining offices within the State of New Jersey at 330 Passaic Ave, Suite 204 Fairfield, NJ 07004.

65. At all times relevant hereto, Defendant Absolute Home Mortgage Corporation, duly existed as a full scale mortgage company doing business with HUD and FHA lending money to borrowers to purchase and refinance homes and servicing mortgages.

66. At all times relevant hereto, Defendant Absolute Home Mortgage Corporation, was doing business, in the State of New York, maintaining offices within the State of New Jersey, with a principle office at 330 Passaic Ave, Suite 204 Fairfield, NJ 07004.

67. At all times relevant Defendant Absolute Home Mortgage Corporation Loans was and is a domestic corporation, limited liability company, not-for-profit corporation, domestic partnership, proprietorship (or other domestic business entity), organized and existing pursuant to, and by virtue of, the laws of the State of New Jersey.

68. At all times relevant hereto, Defendant Absolute Home Mortgage Corporation Loans was authorized to do business, was in fact doing business, in the State of New Jersey, maintaining offices within the State of New Jersey at 330 Passaic Ave Suite 204, Fairfield, NJ 07004.

69. At all times relevant hereto, Defendant Absolute Home Mortgage Corporation duly existed as a full-service mortgage broker and hard-money Lending, servicing and originating loans duly organized and existing under and by virtue of the laws of the State of New Jersey.

70. At all times relevant Defendant Absolute Home Mortgage Corporation Loans was co-conspirator in the Fraud for Profit lending scheme committed against Plaintiff.

71. At all times relevant Defendant Intercoastal Abstract Company, a domestic corporation, limited liability company, not-for-profit corporation, domestic partnership, proprietorship (or other

domestic business entity), organized and existing pursuant to, and by virtue of, the laws of the State of New York.

72. At all times relevant hereto, Defendant Intercoastal Abstract Company was authorized to do business, and was in fact doing business, in the State of New York, maintaining offices within the State of New York, for example at 31 Stewart Street Floral Park, New York 11001.

73. At all times relevant hereto, Defendant Intercoastal Abstract Company a domestic corporation, limited liability company, not-for-profit corporation, domestic partnership, proprietorship (or other domestic business entity), organized and existing pursuant to, and by virtue of, the laws of the State of New York

74. At all times relevant hereto, Defendant Intracoastal Abstract Company Inc. was authorized to do business, and was in fact doing business, in the State of New York, maintaining offices within the State of New York, for example at 31 Stewart Street Floral Park, New York 11001.

75. At all times relevant hereto, Defendant Intracoastal Abstract Company Inc. duly existed and at all times relevant hereto, Defendant Intracoastal Abstract Company Inc.a domestic corporation, limited liability company, not-for-profit corporation, domestic partnership, proprietorship (or other domestic business entity), organized and existing pursuant to, and by virtue of, the laws of the State of New York.

76. At all times relevant Defendant Intracoastal Abstract Company Inc. was a co-conspirator in the Fraud for Profit lending scheme committed against Plaintiff.

77. At all times relevant Defendant Tri Costal Abstract was believed to be a domestic corporation, limited liability company, not-for-profit corporation, domestic partnership, proprietorship (or other domestic business entity), organized and existing pursuant to, and by virtue of, the laws of the State of New York with offices at 31 Stewart Avenue Floral Park, NY 11001 was in fact

doing business, in the State of New York, maintaining offices within the State of New York, with offices located at 31 Stewart Street Floral Park, New York 11001

78. At all times relevant hereto, Defendant Tri Costal Abstract duly existed as an abstract and title company.

79. At all times relevant Defendant Tri Costal Abstract was a co-conspirator in the Fraud for Profit lending scheme committed against Plaintiff.

80. At all times relevant Defendant Bill Wilson aka William E Wilson, upon information and belief was and is President, employee, affiliate or employee of Tri Costal Abstract.

81. At all times relevant Defendant Bill Wilson aka William E Wilson, was the Title closer and also Public Notary for the State of New York in 2015.

82. At all times relevant Defendant Bill Wilson aka William E Wilson, Public Notary qualified in the Suffolk County and acted as the 2014 Title Closer.

83. At all times relevant Defendant Bill Wilson aka William E. Wilson was a co-conspirator in the Fraud for Profit lending scheme committed against Plaintiff.

84. At all times relevant Aliya J. Nelson ("Defendant Nelson"), was and is the Managing Partner of Aliya J. Nelson, P.C.

85. At all times relevant Aliya Nelson P.C.("Defendant Nelson PC") was and is a domestic corporation, limited liability company, not-for-profit corporation, domestic partnership, proprietorship (or other domestic business entity), organized and existing pursuant to, and by virtue of, the laws of the State of New York.

86. At all times relevant hereto, Defendant Nelson was authorized to do business, and was in fact doing business, in the State of New York, maintaining an office at 315 Madison Avenue Ste. 901 New York New York 10017 within the State of New York.

87. At all times relevant hereto, Defendant Nelson duly existed as a Plaintiff's Legal counsel in 2016 for the purposes of advising Plaintiff on the 2016 refinance with Defendants Grodsky, 2386 Hempstead Inc, and Windfield.

88. At all times relevant Defendant Nelson was a co-conspirator in the Fraud for Profit lending scheme committed against Plaintiff. in 2016.

89. At all times relevant Maria Terasco ("Defendant Terasco"), was the Notary Public who represented Defendant Grosky's interests in the 2016 closing.

90. At all times relevant Defendant Terasco, was and is a notary public registered under the State of New York qualified in Suffolk County #01TA6073704 who's commission is expired on April 29th 2018.

91. At all times relevant Defendant Terasco was a co-conspirator in the Fraud for Profit lending scheme committed against Plaintiff. in 2016.

92. At all times relevant Zeichner Ellman & Krause LLP (" Defendants Zeichner Ellman & Kraus") a large domestic corporation, limited liability company, not-for-profit corporation, domestic partnership, proprietorship (or other domestic business entity), organized and existing pursuant to, and by virtue of, the laws of the State of New York specializing in providing legal counsel to real estate professionals.

93. At all times relevant hereto, Defendants Zeichner Ellman & Krause was authorized to do business, and was in fact doing business, in the State of New York, maintaining offices within the State of New York, for example at 11211 Avenue of the Americas New York, New York 10022.

94. At all times relevant to this information Defendants Zeichner Ellman & Kraus LLP were co-conspirator in the Fraud for Profit lending scheme against Plaintiff.

95. Defendant Horneffs and is also charged herein purported to be a business with an interest in

providing legal counsel to real estate professionals.

96. At all times relevant hereto, Mark W. Schlussel Esq. ("Defendant Schlussel") is a managing

   partner, owner and principle of Defendant Zeichner Ellman & Krause LLP.

97. At all times relevant hereto, Defendants Schlussel Esq. provided legal Counsel to Sedgwick

   Mortimer and Defendants Horneffs.

98. At all times relevant to this information Defendants Zeichner Ellman & Kraus LLP were co-

   conspirator in the Fraud for Profit lending scheme against Plaintiff.

99. At all times relevant Heidi J Sorvino ("Defendant Sorvino"), in her capacity of appointed

   Chapter 11 Corporate Trustee

100.      At all times relevant Defendant Sorvino in her capacity of Chapter. 11 Trustee was and is

   Partner of White and Williams LLP a domestic corporation, limited liability company, not-for-

   profit corporation, domestic partnership, proprietorship (or other domestic business entity),

   organized and existing pursuant to, and by virtue of, the laws of the State of Pennsylvania. with

   its principal office at 1650 Market Street Suite 1800 Philadelphia, PA 19103-7395.

101.      At all times relevant, and upon information and belief Defendant Sorvino Esq. is a co-

   conspirator in the Fraud for Profit lending scheme committed against Plaintiff in 2020.

102.      At all times relevant hereto, William Horneff,  Elizabeth Horneff and John Horneff

   ("Defendants Horneffs) were private" hard money lenders to Plaintiff from 2011 to 2014.

103.      Defendant Horneffs were doing business, in the State of New York, but maintaining

   offices within the State of New Jersey at 1 Eckart Farm Road Saddle River New Jersey

104.      At all times relevant, Defendant Horneffs were co-conspirator in the Fraud for Profit

   lending scheme committed against Plaintiff in 2014.

105.      At all times relevant Wolinsky Law Group LLP (" Defendants Wolinsky Law Group PC"

   a small domestic corporation, limited liability company, not-for-profit corporation, domestic

partnership, proprietorship (or other domestic business entity), organized and existing pursuant to, and by virtue of, the laws of the State of New York specializing in providing legal counsel to real estate professionals.

106.    At all times relevant hereto, Alan M Wolinsky Esq. ("Defendant Wolinsky") was and is Partner of Wolinsky Law Group P.C. and Counsel to Defendants Grodsky and 2386 Hempstead in 2017.

107.    At all times relevant to this information Defendants Wolinsky was a co-conspirator in the Fraud for Profit lending scheme against Plaintiff.

108.    At all times relevant hereto, Defendants Wolinsky Law Group P.C. was authorized to do business, and was in fact doing business, in the State of New York, maintaining offices within the State of New York, at 160-02 Remington Boulevard Ronkonkoma, New York 11779

109.    At all times relevant to this information Defendants Wolinsky Law Group P.C. were co-conspirator in the Fraud for Profit lending scheme against Plaintiff.

110.    At all times relevant to this information Defendants Wolinsky Law Group P.C. was a co-conspirator in the Fraud for Profit lending scheme against Plaintiff.


### ZEICHNER ELLMAN & KRAUSE LLP AND LENDERS DEFENDANTS HORNEFFS
### (Unjust Enrichment)

111.    Plaintiff was the guarantor of a 2011 mortgage she placed on the property.

112.    The mortgaged premises, 60 West 91 Street, New York, New York (the "Premises") is owned by a 60 91st Street Corporation is a New York State Corporation with its principal place of business at 60 West 91st Street New York 10024.

113.    The mortgage premises has been and the Plaintiff's private family home for over 75 years.

17

114.    The Plaintiff is 100% owner of the mortgaged premises.

115.    The mortgaged premises is an multi-family apartment building consisting of nine (9) units, and is located on the Upper West Side of Manhattan.

116.    Defendant Horneff's were private hard money lenders who provided the mortgage in 2011 for four-hundred-thousand  ($400,000) dollars.

117.    Plaintiff made payments on this loan from 2011 to 2014.

118.    Plaintiff has never met Defendant Horneffs.

119.    Upon information and belief Defendant William Horneffs and Defendant Grodsky and 2386 Hempstead Inc are the same lenders.  (See Exhibit 1: Title Insurance Closing Invoice).

120.    Notably, this was never disclosed to the Plaintiff.  Nor did Plaintiff ever agree to use the same lender in the 2014 refinancing.

121.    In 2014 Plaintiff's brother, Sedgwick Mortimer sought legal counsel from Zeichner Ellman & Krause LLP to discuss a real estate matter with respect to his family's distressed property.  (See Exhibit 2 Letter from Zeichner Ellman and Kraus to Plaintiff's brother).

122.    At the time, Plaintiff's brother disclosed *"**private privileged and confidential**"* information to Defendant Schlussel regarding the Plaintiff's financially *"distressed"* property.

123.    On October 10th, 2014 Plaintiff's brother Sedgwick Mortimer also discussed the matters with the District Attorney Special Prosecutors' Bureau.

124.    Defendant Schlussel Esq. accepted the letter of engagement pursuant to Part 1215 to Title 22 of the Official Compilations of Codes, Rules and Regulations of the State of New York on June 6th, 2014 (See 2014 Exhibit 2 Zeichner Ellman and Kraus Letter of Engagement).

125.    Defendant Schlussel then used the ***"private privilege and confidential"*** information to enrich himself via his firm by disclosing the information Plaintiff's adversary.

126.   Neither the Plaintiff nor her brother sanctioned the release of the "**private privileged and confidential**" information to a third party.

127.   Plaintiff became aware of the collusive endeavor between Defendants Schlussel and Horneffs stopped making payments to Defendants Horneffs.  (See Exhibit 3 default notice from Defendant Zeichner Ellman and Kraus).

128.   In 2014, Defendant Horneffs initiated a separate legal proceeding against Plaintiff (See Exhibit 3 default notice from Defendant Zeichner Ellman and Kraus), and used Defendant Zeichner Ellman and Kraus LLP to represent him.

129.   Notably Defendant Schlussel used different stationary, which hide his name and affiliation with the firm. (See Exhibit 2: Defendants Zeichner Ellman and Kraus's Letter of Engagement by Defendant Schlussel).

130.   Zeichner Ellman and Kraus LLP should have reclused itself from representing the Defendant Horneffs, because in so doing, violated "attorney client" privilege.

131.   Since Plaintiff was unsuccessful, in the proceedings, Plaintiff was liable for Zeichener Ellman & Krause's Legal Fees for sixty-eight thousand four hundred one dollars and four cents ($68,401.04)  See Exhibit 4 Schedule A 2015 closing statement created by Ana Park of Defendants Zeichner Ellman and Kraus).

132.   Defendant Schlussel had superior knowledge of essential facts about Plaintiff's financially *"distressed"* premises and used the information to enrich himself and/or his firm by disclosing the information to the Defendants Horneffs.

133.   Defendant Schlussel used the information given to him from Plaintiff's brother Sedgwick Mortimer to financially benefit from it.

134.   Additionally, Zeichner Ellman & Krause LLP calculated a default interest cost at

135. 17% when in fact, according to the original mortgage documents, should have been 16%.

136. Notably, neither Plaintiff nor her brother has never met the Horneffs.

137. Upon information and belief the Defendants Horneffs were involved in this **"Fraud for Profit"** scheme.

138. Plaintiff believes the action by Defendant Schlussel was unconscionable, predatory, and onerous in nature.

139. The actions of Defendants Zeichner Ellman and Kraus, because she was forced to pay for the legal fees of Defendants Zeichner Ellman and Kraus.

140. Plaintiff was financially harmed by the actions of Defendants Zeichner Ellman and Kraus, because she was force to refinance her property, thus further encumbering her property.

141. The initial four-hundred-thousand dollars loan balloon to one-million four hundred thousand dollars ($1,400,000).

## 2014 REFINANCE

142. On or about 2014, Plaintiff Mortimer responded to an unsolicited mail advert sent to her by Thomas Sidford of Sidford Funding. (See Exhibit 5 letter from Sidford)

143. Mr. Sidford told Plaintiff that he had seen her property being listed on the "NYC lien sale auction" and offered to introduce her to private lenders who would be willing to offer funding.

144. Mr. Sidford introduced Plaintiff Mortimer to Defendant Winfield as the Lender. (See Exhibit 8 : Emails introducing Defendant Windfield as Lender).

145. Defendant Winfield made materially false representation to Plaintiff that he was a broker who had formerly worked on the trading floor as a trader, and had since turned commercial lender with his partner, colleague and associate, Defendant Grodsky.

146.     Defendant Windfield purported that he and his partner Defendant Grodsky, would be willing to lend one million four hundred ($1,400,000) dollars, if Plaintiff would guarantee the loan.

147.     Defendant Windfield introduce Plaintiff to his partner Defendant Grodsky.

148.     Plaintiff agreed to guarantee the debt and elected to a cash out payment of $142K. $42,000 of which Plaintiff would use to pay the 12 months of interest up front.

149.     Plaintiff also asked Defendant Windfield and Grodsky to provide her with an accounting of the fees and charges etc. to review, prior to the actual closing.

150.     Defendant Windfield provided Plaintiff with a Letter of Intent ("LOI/Term-Sheet" showing anticipated fees and charges for the 2015 closing.

151.     Defendant Windfield asked Plaintiff to pay $2000 for a licensed building inspection fee.

152.     Notably, Defendant Windfield conducted the building inspection himself.

153.     Defendant Windflied is not a licensed building inspector.

154.     Defendant Windfield and Grodsky asked if Plaintiff was interested in a reducing the monthly interest payments by half.

155.     Defendant Windfield and Grodsky purported that they were willing to decrease the monthly payment to $3500 per month by taking a portion of the original interest payments and adding that spread to the back end of the loan principle which would be paid at the maturity of the loan and when the loan was transferred to another lender.

156.     Plaintiff agreed and asked for a complete accounting showing the anticipated fees, charges and costs.

157.     Defendants Winfield and Grodsky gave Plaintiff several versions of the closing accounting numbers, none of which made sense or could be reconciled.

158.     The accounting was complicated to obfuscate the scheme.

159.     Plaintiff was never given the documents which accurately detailed the charges fees, or costs of the loan.

160.     Defendants Grodsky and Winfield offered to provide financing for $1.4M at a discounted rate, but then failed to disclose the rate that would ultimately be charged.

161.     Defendants Grodsky and Winfield also took an additional $500K in funds from the Plaintiff cloaked as fees, costs charges and unreleased escrow.

162.     Defendants Grodsky and Winfield told Plaintiff that she would be paying one rate but ultimately, paid a completely new and different rate.

163.     Plaintiff never agreed to this new and different rate.

164.     Defendants Grodsky and Winfield, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money or property by means of false and fraudulent pretenses, representations, and promises and attempting to do so, did transmit and cause to be transmitted by means of writing, signs, radio, and television communication in interstate foreign commerce, writings signs, signal, pictures and sounds for the purpose of executing such schemes and artifice, to wit and defraud Plaintiff.

165.     Defendants Grodsky and Windfield made materially false representations to Plaintiff in order to induce Plaintiff into entering into and guaranteeing a mortgage that they alleged was more affordable – but was not.

166.     In 2015 Plaintiff was provided with a Letter of Intent ("LOI/ term-sheet") which listed the terms and conditions of the anticipated loan. (See Exhibit 7: LOI/Term sheet),

167.     Plaintiff returned the terms-sheet with comments and questions relating to the loan, lender, points and fees.

168.     Many questions were left unanswered by Defendants Grodsky and Winfield

169.     Defendant Grodsky and Windfield fielded Plaintiff questions to Defendant Koulouris.

170.     Defendant Koulouris introduced herself as Defendant Winfield's assistant.

171.     It was unclear by the documents what Defendant Koulouris role was in the refinancing.

negotiations.

172.     Defendant Kouluoris initially told Plaintiff that she was helping Defendant Windfield and

Grodsky and they were both working for Absolute Home Mortgage Corporation Loans as brokers.

173.     However, according to the NYS Department of Incorporation website, Defendant

Koulouris was employed by Defendant Absolute Home Mortgage Corporation Loans.

174.     Defendant Kolouris was also listed as a Principal for ASAP Consulting.

175.     However, it was later evidenced via Defendant Koulouris' email correspondence that she

was employed by Absolute Home Mortgage Corporation as a loan Originator.  (See Exhibit 8

email showing Anatasia's Absolute Home Mortgage Corporation email address).

176.     Realizing the inconsistencies and discrepancies Plaintiff conducted a search of

Absolute Home Mortgage Corporation, 2386 Hempstead Inc., ASAP Consulting, Intra Coastal

Abstract, Inter Costal Abstract, General Abstract Title on the New York State Department of States

Division of Incorporations Website.

177.     Notably, in 2014, 2386 Hempstead Inc. was not listed on the New York State Division of

Incorporation Corporate Database.   Nor was Inter, Absolute, General (See Exhibits 10:

Department of State Records Database).

178.     Defendant Koulouris was licensed with the New York State Department of Banking

under Absolute Home Mortgage Corporation Loans in 2014. (See Exhibit 11: Defendant

Koulouris listed as Absolute Home Mortgage Loan Employee).

179.     Plaintiff contacted Absolute Home Mortgage Corporation to verify the employment of

Defendants Koulouris and Winfield.

180.     Absolute Home Mortgage Corporation Loan's lack of transparency was very

disturbing.

181.     Plaintiff eventually spoke to Laura Goetz Absolute Home Mortgage Corporation

Loan's alleged Principals.

182.     Lauren Goetz told Plaintiff that although Absolute Home Mortgage Corporation knew

Defendant Winfield, he **was not** (1) one of their licensed brokers nor (2) did he work for

Absolute Home Mortgage Corporation Loans.

183.     Lauren Goetz told Plaintiff that Defendant Koulouris **was** currently an employee of

Absolute Home Mortgage Corporation Loans.

184.     Ms. Goetz told Plaintiff that she was allegedly unaware of any loans being underwritten

with respect to the premises located at 60 West 91st Street New York City New York 10024.

185.     This information was contrary to what Defendants Winfield, Grodsky and Kouloris

told Plaintiff.

186.     Defendant Windfield now told Plaintiff that he was (1) *"in the process of*

*getting his real estate broker's license" (2) he did not work for* Absolute Home Mortgage

Corporation Loans *(3) Defendant Koulouris was only his assistant.*

187.     Defendant Winfield told Plaintiff that Defendant Grodsky's Lending Team included:

Defendant Grodsky, Defemdamt 2386 Hempstead Inc., Defendant Kocoris, Defendant Moberg

& Kocoris, a.k.a. and d.b.a. General Abstract Services, Defendant Winfield Defendant Koulouris

Defendant ASAP Consulting, Defendant Donna Schofer of Intra Coastal Abstract, Defendant

Intra Coastal Abstract.

188. Defendants did not disclosed the identity of William E. Wilson to the Plaintiff until the day of the 2015 closing.

189. Defendant William E. Wilson introduced himself to Plaintiff as Title Closer and Public Notary who was certified in Nassau County New York under the registration number: 01WI6023601. (See Exhibit 14: Undertaking Statement showing Defendant Wilsons notary registration number).

190. Defendants never disclosed to Plaintiff that he was an employee, owner, or affiliate of Inter Costal Abstract or its role in the refinancing.

191. Plaintiff only circuitously found out that Inter Costal Abstract was the "shell" escrow company in the 2015 refinance.

192. Notably this almost one year later.

193. At the Plaintiff request, the DHCR's Legal Assistant II Gloria Graham, sent a copy of the correspondence to Mr. William E Wilson. (See Exhibit 12 DHCR's August 21st 2015 letter to William Wilson of Tri Costal Abstract).

194. Notably, the Defendants never told Plaintiff that moneys due her had been returned.

195. Defendants attempted to actively conceal this from the Plaintiff by not communicating to her that money were now available and due her.

196. It should be noted that the individual who had identified himself to the Plaintiff as Defendant Grodsky; and had endorsed the closing documents in 2014 was not Scott Grodsky.

197. Nor was he the individual who came to the Plaintiff's premises on May 11th and 12th 2020 with the appointed Chapter 11 Bankruptcy Trustee.

198. This was a totally different man whom the Plaintiff had never met or seen before.

199. This was identity fraud.

200. Defendants Windfield, Grodsky, Nelson, Horneffs and Waldhauser are liable for fraud because they had particular knowledge that the man who came to the 2015 and 2016 closing to effectuate the closing documents and represented to be the Lender Defendant Grodsky, **was not** the Lender or Principle of 2386 Hempstead Inc.

201. Defendants actively concealed these issues from Plaintiff.

202. Defendants are liable for fraud because they had particular knowledge that (1) Defendant William Horneff, was actually the same Lender Defendant Grodsky as represented on the Title Insurance Closing Invoice # ORT-021451NY. (See Exhibit 1); and (2) commingled and withheld funds that were due to the Plaintiff.

203. In the end a $400,000 ballooned into one-million-four-hundred-thousand , (1,400.000) dollars and Plaintiff was defrauded of no less than five-hundred-thousand dollars ($500,000).

## 2015 REFINANCE

204.    Late 2015 Plaintiff guaranteed the mortgaged of one million four hundred thousand dollars ($1,400,000).

205.    Plaintiff hired Mahir Nisar Esq. of Waldhauser and Nisar, LLP to represent her; Mr. Nisar agreed to take on the instruction for $5000.

206.    For reasons unknown, and without explanation, his partner Defendant Waldhauser Esq. took over the instruction instead and charged an additional $3000.

207.    The initial due diligence leading up to the closing, in so far as the fees, charges and costs, was again obfuscated by inaccurate accounting.

208.    There were items that allegedly clouded title and needed to be paid, to insure the title would be free and clear to refinance.

209.    There were several versions of the "Title Insurance Closing Invoice", "Statement of

Mortgage Closings", and final disbursement accounting numbers, fees etc.  (See Exhibits 15 - 18).

210.    The original loan amount of four hundred thousand dollars ($400,000) ballooned into one million four hundred thousand dollars. ($1,400,000).

211.    The Title Insurance and Closing Invoice etc. varied from one to the next, showing inaccurate closing totals (See Exhibit 15-18) and were impossible to reconcile.

212.    Plaintiff did not receive $142K cash out at the closing which Defendant Grosky and Winfield agreed to.

213.    Intracoastal Abstract Inc. had received $133,108.20, (See Exhibit 18: Copy of draft to Intracoastal Abstract).

214.    This was twice the face value of the initial judgements which clouded the title.

215.    Another disturbing item was a October 15th 2015 letter sent by Defendant Donna Schofer of Intracoastal Abstract sent to Plaintiff's attorney Defendant Waldhauser.

216.    In that letter Defendant Schofer stated that her escrow department had only received and escrowed $6925.62 at the 2015 closing. (See Exhibit 19: Letter from Donna Schofer.

217.    However, according to the Statement of mortgage closing (See Exhibit 17: Intra Coastal Abstract had received $133,108.20).

218.    Plaintiff notified Defendant Waldhauser of the inaccurate accounting on various other documents.

219.    Specifically, Plaintiff did not receive one-hundred and forty-two thousand dollars ($142,000) cash-out as per the agreement.

220.    Defendants were paid the following:

        a   Moberg & Kocoris $6500 (See Exhibit 21: Copy check);

27

    b   Intra Coastal Abstract received $113,108.20, (See Exhibit 21: copy of check).

    c   Defendant Horneffs.

    d   Defendant Bill Wilson $500 (See Exhibit 23: copy bank draft

    e   Zeichner Ellman & Krause LLP (See Exhibit 4: Closing document of Zeichner Ellman Kraus: Copy check);

    f   ASAP Consulting $28,000 (See Exhibit 25: copy check)

    g   an additional $685.33 to Intra Coastal Abstract (See Exhibit 25: Copy check).

165.    Plaintiffs reliance on the Defendants misrepresentations that she would receive a cash out payment of $142,000 was one of the reasons why Plaintiff obtained and guaranteed the loan.

166.    When Plaintiff questioned why Defendant Intra Coastal Abstract had received $113,108.20, Plaintiff was told that it was "standard procedure" for an escrow company to take twice the face value of funds to cover any judgements which *"clouded title"*.

167.    Plaintiff told Defendant Waldhauser that she was entitled to receive more funds.

168.    Defendant Waldhauser told Plaintiff he could do nothing and directed Plaintiff to contact the Defendant Intra Coastal Abstract directly.

169.    Defendant Schofer told Plaintiff that Defendant Intra Coastal Abstract they had nothing to do with the escrowed funds, and that she should contact the "lender's" attorney, Defendant Kocoris.

170.    Plaintiff called, sent emails and multiple letters requesting that the remaining balance be released to her.

171.    Plaintiff also requested an audit of the closing numbers, (See Exhibits 27: Letters to James Kocoris Esq.).

172.    Plaintiff contacted DHCR's Legal Assistant, Gloria Graham.

173.    Ms. Graham told Plaintiff that not only had the outstanding judgments from her agency been satisfied, but also the Department had also received $11,000 of over payment which was returned.

174.    Plaintiff asked Ms. Graham to forward a copy of the cancelled check and letter which was sent to Tri Costal Abstract.

175.    A check was never forwarded to the Plaintiff despite closing one year earlier.

176.    The check and correspondence was returned to Defendant William Wilson of Inter Costal Abstract. (See Exhibit 12: copy of check from DHCR and correspondence).

177.    It was never disclosed to Plaintiff who Defendant William Wilson was, his relationship or to the closing was.

178.    It was never disclosed to Plaintiff what Defendant Inter Costal Abstract was or it's role or involvement in the 2015 closing.

179.    Indeed, up to this point Plaintiff had never heard of Tri Costal Abstract Company.

180.    Upon information and belief Defendant Tri Costal Abstract was attempting to conceal it's involvement in the loan as was Defendant Absolute Home Mortgage Corporation Loans.

181.    Defendant Tri Costal Abstract company was being used as a quasi-registered "shell" escrow company.

182.    Plaintiff understood the abstract company to be Intra Coastal Abstract Co. **not** Inter Costal Abstract. Notably, Tri Costal Abstract and Inter Costal Abstract, operate from the same location: 31 Stewart Street, Floral Park, New York 11001.

183.    Inter Costal Abstract Company failed to disclose it's position as the escrow agent to the Plaintiff.

184.    Please note that the cancelled check originated from Moberg and Kocoris (See Exhibit

___: voided check).

185.    The returned check was then added to the alleged escrowed funds that was sent from

Inter Costal Abstract and NOT Intra Coastal Abstract for $15,755.00 (see Exhibit 29: Letter).

186.    Plaintiff believed a credit balance was due to her of approximately $142,000.

187.    In an effort to reconcile the accounting discrepancies Plaintiff asked Defendant

Grodsky, Winfiend, Kocoris and Waldhauser etc. to reimburse the funds.

188.    None of the Defendants have responded to date.


## 2016 REFINANCE WITH DEFENDANT GRODSKY

189.    In 2016 Defendant Grodsky's once again used Defendant Korcoris Esq. Defendant General

Abstract Services.

190.    Notably, Defendants Moberg & Kocoris and d.b.a General Abstract Services located and

operated out of the same offices 150 Broadhollow Road Ste. 320 Melville, New York 11747. (See

Exhibit 6: Brochure General Abstract).

191.    In 2016 Defendant Waldhauser Esq. was replaced by Aliya J. Nelson Esq. ("Defendant

Nelson") as Plaintiff's new counsel.

192.    Before accepting the instruction, Defendant Nelson stated that her husband, Harvey Newkirk

Esq. was charged, convicted and imprisoned for wire fraud.  Charges she believed were allegedly

false. (Index:15-cr-1073 See Exhibit 55: Complaint and Order U.S. -vs- Newkirk).

193.    Plaintiff appreciated Defendant Nelson's candor regarding her husband's plight.

194.    Plaintiff did not believe Defendant Nelson's ability to represent her would be compromised

by her husband's misfortune.

195.    Plaintiff hired Defendant Nelson because she had been recommended to the Plaintiff by another attorney.

196.    As it will be later evidenced in this complaint, Defendants were all co-conspirators in the Fraud for Profit scheme against Plaintiff.

197.    Plaintiff told Defendants Winfield, Grodsky, Kocoris and Nelson that she **had not** been given the full amount of her cash advance in 2015

198.    Plaintiff specifically asked Defendant Grodsky to instruct his attorney Defendant Kocoris to release the remaining funds due her immediately. (See Exhibit 56 request to release funds).

199.    Defendant Grodsky initially told Plaintiff that he was allegedly unaware of any funds being held in escrow for Plaintiff.  However, Defendant Grodsky told Plaintiff that she should contact her Defendant Nelson. (See Exhibit 57 Defendant Grodsky letter to Plaintiff).

200.    Plaintiff contacted Defendant Nelson and asked that she release the funds.

201.    Defendant Nelson denied that she was in receipt of any escrowed funds.

202.    Defendant Windfield and Grodsky provided Plaintiff with a term-sheet for the new loan. (See Exhibit 58: 2016 Term Sheet).

203.    Plaintiff then returned the documents with her comments, questions and mark-up; as she had done for the 2015 loan.

204.    On about June 2015, approximately four (4) months before closing of the second refinance, Plaintiff asked Defendants Nelson Winfield and Grodsky and Kocoris, for a full breakdown of charges, fees and full closing costs.

205.    After 6 months, Plaintiff had still not received anticipated closing numbers from Defendants.

206.    Plaintiff then asked Defendants Nelson Winfield Grodsky and Kocoris for an accurate accounting ALL of the closing numbers including the additional lenders fee for potentially

discounting any deferred interest payments.

207.   Plaintiff received only a partial accounting of the fees and charges and closing costs to review.

206.   Most of the accounting items were questionable. Specifically, an additional charge for $15,000 for a title report and title insurance policy, (9.99%) 10 points to refinance, $200,000 in fees.  However, there were additional concerning charges and fees.

207.   Plaintiff thought this was an exorbitant amount considering she had paid fifteen thousand dollars ($15,000) and refinanced twelve months prior.

208.   Defendants never told Plaintiff that the loan documents would be changing.

209.   Defendants never communicated to Plaintiff that there would be a new CEMA documents or the new anticipated closing costs.

210.   Plaintiff never agreed to these new anticipated closing costs.

211.   Notably, Plaintiff was never given a copy of Title Insurance Policy, which upon information and belief was held by Defendants Grodsky and 2386 Hempstead Inc.

212.   Defendant Grodsky selected the Title Insurance Policy and its details.

213.   Plaintiff did not have any input into the type of policy which ultimately was retained by Defendant Grodsky.

214.   It would be interesting to note what the kind of insurance was taken out by Defendant Grodsky especially if he was insured against the non-payment of real estate or property taxes.

215.   When Plaintiff questioned the anticipated charges, fees and missing documents with Defendants, Grodsky, Windfield, Kocoris and Nelson, Defendant Winfield stated the charges and fees were so-high because the extension was being treated as a ***"new loan"*** and

**not as** an *"extension"* due to the additional cash out.

216.    Plaintiff never agreed to this.

217.    Unsatisfied with the answer, Plaintiff requested Defendants, Grodsky, Windfield,

Kocoris and Nelson put their statements in writing.

218.    Defendants, Grodsky, Windfield, Kocoris and Nelson never provided Plaintiff with

any statements reflecting the same.

219.    Defendant's Windfield, Nelson Grodsky and Kocoris' reluctance to provide Plaintiff

with the statement, an accurate reconcilable accounting of the fees, charges, costs and

disbursement numbers prompted Plaintiff to reevaluate all of the closing documents, fees

charges etc.

220.    The Plaintiff continued to request an accounting of the closing numbers from

Defendants Nelson, Kocoris, Winfield and Grodsky.

221.    Defendants Nelson, Kocoris, Winfield and Grodsky willfully deflected the Plaintiff's

concerns and continued to place blame on each other for not providing the necessary closing

documents and closing accounting numbers to the Plaintiff.

222.    Defendants Nelson, Windfield, Kocoris and Grodsky are liable for fraud because they

had particular knowledge that closing disbursement numbers being presented to the Plaintiff

were not accurate or what Plaintiff agreed upon.

223.    Defendants Nelson, Windfield, Kocoris and Grodsky because they actively concealed

this issue from Plaintiffs in order to defraud her of money.

224.    Defendants are liable for fraud because they had particular knowledge that the closing

disbursement costs, fees and charges that were being presented was not what the Plaintiff had

agreed to.

225.    Plaintiff relied on Defendant Nelson, Winfield, Korkoris and Grodsky promise to provide them prior to the closing.  They did not.

226.    Plaintiff was injured by this because she furthered encumbered herself and the premises with additional financial obligations.

227.    Plaintiff demanded ALL escrowed funds to be released immediately. (See Exhibit 33:

228.    Letters requesting release of escrow money to Defendants Grodsky, Nelson and Kocoris).

229.    One day before the closing, Defendant Nelson told Plaintiff that the closing numbers had finally been calculated.

230.    Defendant Windfield promised Plaintiff to bring the new closing numbers to the table.

231.    Defendant Nelson arrived several hours early to the closing to review the final numbers.

232.    Instead Plaintiff and Defendant Nelson were told that the disbursement numbers had still not been finalized.

233.    Instead, Defendant Kocoris Esq. presented a completely new set of documents for her to sign.  Specifically, CEMA.

234.    Plaintiff had never seen the new CEMA documents before her.

235.    Furthermore, and upon further discovery, the Terms and Conditions that Plaintiff agreed to guaranteed in 2015 were not included in the new 2016 documents.

236.    Plaintiff was now being presented with amended unverified closing documents.

237.    What is notable is Defendant Nelson was allegedly not aware that the documents had been changed from the original terms and conditions Plaintiff had agreed to in 2014.

238.    Defendant Nelson had been hired to review the same.

239. As per the Plaintiff's hand-written comments on the term sheet, Plaintiff had specifically stated that the contents therein remain the same. (See Exhibit 36 LOI and handwritten comments).

240. Plaintiff was injured by this because the new closing documents terms and conditions were very egregious in nature. Specifically, there was a section that read **"the borrower had been given three hundred thousand dollars ($300,000) in cash as an advancement..." (that day.).** (See Exhibit 37 first page of the new document with Defendant Nelson's handwritten changes).

241. This is false.

242. Plaintiff was not been given three hundred thousand dollars in cash at the closing or at any other time!

243. Never-the-less, Defendant Kocoris insisted that Plaintiff sign and guarantee the document.

244. Defendant Kocoris told Plaintiff that it was normal business protocol to request this amount in an extension.

245. Plaintiff refused.

246. There were other irregularities:

    a. Misclassification of the property.

    b. The new documents listed the property as "investment non-owner occupied" property", when in fact the property had been the Plaintiff's family primary home for over seventy-five (75) years.

247. The closing stalled for three hours due to the Plaintiff refusal to sign the new and unauthorized closing documents.

248. In order to move the closing forward, Defendant Nelson promised to provide an affidavit to the Plaintiff substantiating what transpired at 2015 closing and confirm that the Plaintiff had not in fact received three hundred thousand dollars ($300,000) in cash at the closing. Nor would she be liable of any tax consequences as a result.

249. Defendant Nelson has to date not given Plaintiff the promised affidavit of the same.

250. Defendant Nelson willfully misled Plaintiff and moreover, did not use jurisprudence at the closing, nor did she fulfill her fiduciary obligations relating to Plaintiff's affairs.

251. Defendants Nelson , Kocoris, Grodsky and Winfield,are liable for fraud because they had particular knowledge that the closing 2016 CEMA was not the same as the 2015 closing documents, and did not include the terms and conditions agreed upon by the Plaintiff.

252. Plaintiff relied on Defendant Nelson, Winfield, Kocoris and Grodsky promise to provide the same closing documents as was memorialized in 2015.

253. They did not.

254. Plaintiff was injured by this because she furthered encumbered herself and the premises with additional financial obligations.

255. Plaintiff permitted Defendant Kocoris Esq. to escrow an addition $10,000.

256. The was used to pay for the annual insurance premium of $6884.11. (See Exhibit 37: escrow check to pay off the annual insurance premium of $6884.11. (See Exhibit 38: Escrow agreement).

257. This was done with the understanding that the credit balance would be immediately released to Plaintiff following payment.

258. The insurance premium was paid immediately. However, Plaintiff has yet to be reimbursed the difference of $3115.89.

259.   In 2016 Defendant Grodsky and Windfield asked Plaintiff if she wanted to extend and guarantee the loan for a third year.

260.   Plaintiff refused.

261.   Plaintiff in an effort to expose the fraud that she had been a victim of she filed complaints with the following local, State and Federal agencies:

      a.   Department of Financial Services Online Complaint Platform- June 30th 2017 (See Exhibit 40)

      b.   Attorney Grievance Committee Docket 2017.1226 -  (See Exhibit 41)

      c.   New York State Department of Financial Services Case Number BKM-2017-1211039 - (See Exhibit 42)

      d.   State of New York Grievance Committee for the Tenth Judicial District December 5th 2017 – (See Exhibit 43)

      e.   Federal Trade Commission – (See Exhibit 44)

      f.   Office of the District Attorney Nassau County Complaint 991653-17 December 27th 2017 - (See Exhibit 45)

      g.   Nassau County Bar Association - December 14th 2017 (See Exhibit 46)

      h.   Attorney General Bureau of Consumer Frauds and Protections. December 13th 2017 –(See Exhibit 47)

      i.   The Lawyer's Fund for Client Protection - December 19th 2017 -

262.   On or about 2017 Defendants Grodsky and 2386 Hempstead Inc. initiated a foreclosure action against the Plaintiff's Company 6091 Street Corporation.

263.   Plaintiff who was the Guarantor of the loan was bit served as required by law pursuant to CPLR 3212(b).

264.    Plaintiff did not received the notice, summons or the complaint because the notice had been properly delivered by the USPS.

265.    It wasn't until one and one half (1½) years later, that the Plaintiff received a notice of default judgement against the Plaintiff's Corporate entity. 6091st Street Corporation.

266.    On or about June 2019 Plaintiff hired Stewart Shaw Esq. to vacate the default judgement and file an answer.

267.    Stewart Shaw Esq. had indeed discovered that that Defendants Grodsky and Windfield

268.    Hempstead Inc. and it's co-conspirators had inter alia indeed committed fraud.

## FORECLOSURE ACTION BACKGROUND

*Please note that paragraphs 268 though ¶ 323 were written by Plaintiff's attorney Daniel LoPresti of Shaw and Binder.*

269.    The Plaintiff first encountered someone who was alleging to be Defendant Grodsky as the Lender, when she guaranteed the Promissory Note and mortgage for one million four hundred thousand dollars ($1,400,000).

270.    The note and mortgage were for a one-year term, with interest only payments.

271.    The Plaintiff paid the interest when it was due. Defendant Grodsky then offered to extend the note for another year.

272.    But Plaintiff refused Defendant's Grodsky's offer extend.

273.    As the 2015 loan neared maturity Plaintiff contacted various other lenders and discussed alternative financing.

274.    On    or    about    August    13,    2016,    Defendant    Grodsky    provided Guarantor /Borrower with a written Letter of Intent ("LOI") offering to extend the loan by one

year at 3% interest only, with eight points and a 2% "Broker Fee" to be paid to Lender and stating,

in pertinent part:

> 1.      Lender agrees to lend and *(sic)  additional $100,000* to 60 91 Street Corporation⁸ and extend the loan an additional year.
> 2.      The monthly interest only payment of $3,500.00 will remain the same. And all additional monies and costs associated with the extension will be deferred and *added to the final payoff of the loan.*
> 3.      *At the time the loan is paid in full* the payoff will include the additional $100,000, deferred interest on the additional funds, lender and broker fees associated with the extension, all closing costs including but not limited NY mortgage tax based on the additional $100,000, title searches, lender legal fees for the preparation of revised Mortgage documents and interest on the above referenced deferred charges. (Emphasis added)

275.    After speaking to Lender, the LOI was amended to provide for a broker's fee of 1% of the original loan amount, or $14,000. The terms of the note and mortgage were to be the same as those in the 2015 loan documents (note and mortgage). A copy of the marked up LOI is annexed as Exhibit 34:  This writing was Plaintiff's counteroffer, which Lender accepted in 2015. These terms were discussed with the purported broker (one Defendant Winfield "Winfield" or "Lender's broker") the Plaintiff's agent, and Lender's team, including Defendants Grodsky", Nelson, and Kocoris.

276.    Plaintiff say "purported" broker because Plaintiff has since realized Defendant's actual status and capacity was deceptive. As will be explained elsewhere, Defendant Winfield was actually a highly conflicted "dual agent" who wore two other hats: One as Plaintiff's and Borrower's broker "**Borrower's broker**" as well as a partner or principal of the 2386 Hempstead Inc" and Lender.

277.    This morass was inherent with conflict.  Such "unclean hands" and breach of fiduciary duty to me should be imputed to the Lender-Defendants.

278.    As Lender's broker, it has now become apparent that Winfield's job was to obtain the highest interest rate and most onerous terms in favor of the Lender to further the Lender's interest, and not Plaintiffs.

279.    On the other hand, it has now become also apparent that the Borrower's broker, as such, should have had the opposite goals, so as to discharge his fiduciary obligation to the Plaintiff, to obtain, for example, the lowest interest rate upon terms most favorable to me, which could necessarily diminish the protection of the lien of the Lender's mortgage sought to be achieved by Plaintiff.

280.    Defendant Winfield never disclosed, let alone explained, to Plaintiff, this inherent conflict.

281.    Plaintiff requests on this application that equity intervene and protect her.

282.    Defendants Windfield and Grodsky, further agreed that they would defer payment of all closing costs, the additional $100,000 and interest thereon and would add it to the payoff at the time the loan is paid in full (at maturity, when the loan transferred to another lender,  not at the closing).

283.    Once the LOI was negotiated, Plaintiff was satisfied with the terms and ceased looking for alternative financing which was then available in the market.

284.    Plaintiff and Borrower did this in reliance on the terms negotiated in the Letter of Intent ("LOI"). The LOI specifically provided that the terms of the 2016 loan would be substantially the same as the terms of the 2015 loan.

285.    Prior to the closing Plaintiff repeatedly asked Defendant Grodsky and Windfield to provide her with a list of closing costs and to explain to her what would happen at the closing.

286.    Lender(s) never provided Plaintiff with an explanation. Rather, at the closing Plaintiff was confronted with documents that she was told I had to sign or the loan would not be given; this was

an ultimatum. Among other things, Plaintiff was forced to sign a note and mortgage that stated that she was borrowing an additional $300,000 and a new note and mortgage for $1,700,000. This amount was never discussed with Plaintiff and this amount was not funded by Lender.

287.    In the end, Plaintiff was defrauded of approximately $500K. was from 2014 – 2016.

288.    At the closing, on October 3, 2016, for the first time Plaintiff was presented with a Consolidation, Extension and modification Agreement ("CEMA"), a note and mortgage for $300,000 (the "$300,000 mortgage") and a consolidated note and mortgage for $1,700,000."

289.    Notably, Plaintiff did not agree to the loan amount being increased to $1,700,000 and did not receive the proceeds of the $300,000 loan.

290.    Specifically, Plaintiff only received a check for only $87,729.87.

291.    Defendants Winfield and Grodsky ("Lender"), paid itself and others monies from the proceeds of loan that they were not entitled to and which Plaintiff did not authorize.

292.    More the Lender unilaterally, without Plaintiffs' consent or authorization, took 9.99 points, an excess of approximately $34,000.

293.    The Lender also paid itself the broker's fee, and a building inspection fee of $2000, misrepresenting to Plaintiff that the fee was for a broker, and a licensed inspector, when, in fact, it was paid to itself.

294.    Indeed, Defendant Winfield, the alleged broker, told Plaintiff he, along was partners with Defendant Grodsky, of 2386 Hempstead Inc.

295.    This was a collusive endeavor.

296.    Defendant Lenders and co-conspirators never provided Plaintiff with a copy of the Title Insurance Policy and took over $150,000 in escrowed funds never returned any of the escrow funds to the Plaintiff.

297.   Defendant Lenders and co-conspirators never provided accurate accounting to the Plaintiff showing where funds went.

298.   This is a violation of the law.

299.   Finally, Plaintiff never received fully executed copies of the loan documents at or after the closing.

300.   Although Plaintiff was represented by counsel at the closing, neither Defendant Grodsky and/or his Co-conspirators could not explain to Plaintiff where moneys went.

301.   Defendant Grodsky and/or his Co-Conspirators agreed to defer payment of the $100,000 and the closing costs (i.e., at the maturity of the loan).

302.   Plaintiff was also told she had no choice but to sign the papers or the mortgage would not be extended.

303.   Plaintiff was not given a full and fair opportunity to read the documents as she had not been given a copy of the documents to review despite requesting them.

304.   Plaintiff was placed under emotional distress and economic duress.

305.   Plaintiff was coerced and deprived of time to consider and then effectuate, as a professional matter, other alternatives which were apparent in the market.

306.   Plaintiff now knows that the documents do not reflect Defendant Grodsky and his co-conspirators representation to me.

307.   More specifically, rather than merely deferring payment of closing costs and the additional funds and adding them to the payoff, i.e. later down the road at maturity. Lender had Plaintiff sign a new note and mortgage for $300,000 at the closing and forced the Plaintiff to Borrower to borrow $1,700,000 rather than the $1,400,000 amount that was promised.

308.    This was to Plaintiff's detriment because it further encumbered the property, and because Plaintiff did not receive $300,000 (other than the less than $88,000 paid to Plaintiff).

309.    Defendants and his co-conspirators misrepresented the essential terms of the loan and the actual accounting of charges, points fees and cost of the loans.

310.    The closing documents did not state what was promised, thereby denying Plaintiff of her statutory right to fair and honest business practices.

311.    Defendants Grodsky, Windfield and  his co-conspirators also misrepresented the closing costs, seeking entitlement to a broker fee when, in fact, there was no "broker".

312.    Documents from the closing, which my new attorneys only recently received from my former closing attorney Defendant Nelson. (Exhibit 37:), show that both the points and the broker fee went directly to the Lender.

313.    A Lender whom was not at the 2016 closing or whom Plaintiff has never met.

314.    Thus, the actual deal was "masked" until the day of the closing to deprive the Plaintiff of right in fair business practices.

315.    Indeed, there was no meeting of the minds, hence no contractual relationship. Making the 2016 loan even more onerous was the inclusion of a default interest rate of nearly 25%. This loan was made in bad faith with an intent to deprive Plaintiff of her rights of fair business practices under GBL § 349 and NYC Consumer Protection Law Under § 20-700.

316.    The Lender also falsely states that Plaintiff would receive a check for $97,729.87.

317.    This is also false.

318.    Plaintiff did not receive a check for $97,729.97.

319.    Of course, the LOI provided that Borrower would receive $100,000 an additional 2.99% of the loan proceeds, monies that should have gone to Borrower.

320.    Such incestuous Lender-broker-Borrower relationships, in view of the conflicts of the dual agency, should not be countenanced by the Court.

321.    Since the documents that Plaintiff executed do not reflect what Plaintiff agreed to, nor are they the same documents that Plaintiff guaranteed and signed in 2014, the mortgage should not have been enforced against Borrower or the Plaintiff because it violated Plaintiff Civil, Constitutional and Statutory Rights under the law.

322.    Rather, the Mortgage and/or the Note should eviscerated and/or at the very least recalculated to exclude the default interest rate charged to the Principle amount at $25%.

323.    Additionally, because there was no referee hearing.  The referee's computations computed on default by Defendant Kleinberger and without a hearing were false and inaccurate.

324.    No client testimony or affidavit was provided to the Defendant (Referee).

325.    The Defendant Referee's findings were not based on personal knowledge, but heresay, and therefore should not have been confirmed.

326.    Defendants actions are relevant and is indicative of their misrepresentation and lack of good faith.

327.    By December 18th 2018 Plaintiff's company 60 91st Street Corporation ("borrower") was now in default and a judgement entered.

328.    Initially, case was adjudicated to Honorable Mc Manon, but then reassigned to Judge Bluth in Supreme Court New York County under index 850274/2017.

329.    Plaintiff hired Shaw and Binder to represent the borrower to vacate the default judgement and file an answer.

330.    Shaw and Binder found *inter alia* that the 2014, 2015 and 2016 mortgage and refinancing were fraudulent.

44

331.   Plaintiff Counsel established;

    a.   "Plaintiff claims of fraud were accurate and satisfied each element of the cause of action."

    b.   "Defendants misrepresentation and lack of good faith with respect to the mortgage and note were clear."

    c.   "Attorney fees presented by the Lenders attorney in the foreclosure and sale, were not supported by invoices or any documentary evidence."

    d.   "Lack of a valid referee hearing"

    e.   "Referee reports and fee computations that were computed on default and without a hearing were inaccurate and unsubstantiated".

    f.   "That Defendants Windfield, Grodsky used a usurious rate which had been cloaked as fees, charges, points and unreleased escrowed funds."

332.   Despite the superfluous amount of evidence, Judge Bluth ruled against the Plaintiffs request to vacate the default judgement and be heard.

333.   Judge Bluth also allowed Plaintiff's Counsel to withdraw as Counsel.

334.   Unfortunately, Plaintiff could not secure new counsel in time, nor had she the financial resources at that time, to continue the case.

335.   Judge Bluth ordered the foreclosure and sale of the property on November 21st 2019 for sale of property on February 5th 2020.

336.   Plaintiff/Borrower did not have a full and fair opportunity to litigate the issue in State Court.

337.   Plaintiff/Borrower was denied of her Right of trial by jury.

338.    Defendants violated Plaintiffs' statutory and constitutional substantive and procedural due process rights to fair trial.

339.    A Notice of Appeal was filed, but not perfected with the Appeals Court First Department in New York on or about February 2020.  (See Exhibit 49: Notice of Appeal).


## BANNKRUPTCY FILING BACKGROUND

340.    Plaintiff filed for Non-individual voluntary Bankruptcy on February 4th, 2020.

341.    The Case was assigned to Judge Shelley E. Chapman. (Index 20-cv-10338)

342.    On February 4, 2020 (the "Petition Date"), the Plaintiff filed a voluntary non-individual bankruptcy petition *pro se* for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court in the Southern District of New York.

343.    Until the appointment of the Trustee, the Plaintiff operated its business and managed its affairs as a debtor in possession.

344.    On February 28th 2020 Plaintiff hired Charles A Higgs Esq. as Counsel.

345.    On or about March 4th 2020, Plaintiff and her attorney Charles A. Higgs were before the U.S. Trustee Trial Attorney Brian Masumoto for a 341 hearing.

346.    On March 12th, 2020 a Status Conference hearing was conducted telephonically due to the Coronavirus Pandemic.

347.    Plaintiff was't notified that the Status Conference would be conducted telephonically and physically came to the Bankruptcy Court House.

348.    Judge Chapman's Clerk, Mr. Greg White, told Plaintiff that her Attorney was allegedly being delayed in Brooklyn because of another case and would probably not be attending.

349.    On March 12th 2020, Judge Chapman told Plaintiff that Charles A. Higgs, had still not filed a Notice of Appearance with the Court.

350.   Judge Chapman rescheduled the status conference to March 19th, 2020.

351.   On March 19th, 2020 the status conference was conducted telephonically.

352.   Judge Chapman stated that she has not received the Petitions and Schedules of the Plaintiffs corporation ("Debtor).

353.   This was troubling as the Plaintiff had filed all of the Petitions and Schedules together with the Bankruptcy Intake Court Clerk on February 4th, 2020.

354.   Plaintiff also filed the Petition and schedules and with the U.S. Trustee Joseph Nadkarni and with her Counsel Charles A. Higgs Esq.

355.   On March 19th 2020, Charles A. Higgs Esq. had still not filed a retention application with the Courts.

356.   Ronald Terenzi Esq. Counsel of the Defendant Grodsky and Defendant 2386 Hempstead Inc. told the Court that his client had not yet been added to the insurance, and moreover, no cash collateral budget was in place.

357.   Plaintiff's Counsel Charles A. Higgs, did not elucidate to Plaintiff that **no** money could be used for personal use without a cash collateral stipulation in place.

358.   Charles A. Higgs did tell Plaintiff that Defendant Grodsky, President of 2386 Hempstead Inc. was not interested in agreeing to a cash collateral. What Defendant Grodsky wanted the Plaintiff's building outright.

359.   Plaintiff understood that moneys could be used to operate her business.

360.   Plaintiff did use approximately Four thousand dollars ($4000) funds early-on, prior to the and shortly after the appointment of Counsel.

361.   These funds were primarily used to secure personal protective items against Covid -19 for Plaintiff, her family, and her tenants.

362.    On March 19th, 2020 Judge Chapman directed Charles A. Higgs Esq. contact the insurance company to have the secured creditor (Defendant 2386 Hempstead Inc) added to the Plaintiff's building's insurance policy.

363.    On March 19th 2020 Judge Chapman reminded Charles Higgs Esq. that he was Counsel to the Debtor, and had a responsibility to explain aspects of the Bankruptcy Law to the Plaintiff.

364.    Judge Chapman stated on the record that Charles A. Higgs that *"he wasn't doing his job properly"*, *"needed to do his job"* and she *"would hold him responsible"*.

365.    Charles A. Higgs Esq. was officially retained by Plaintiff on April 16th 2020 to represent her Corporation (60 9!st Street Corporation) *nunc pro tunc* to February 28th 2020.

366.    On March 19th, 2020 Judge Chapman stated she was apparently frustrated by the case, that "she didn't understand what was going on with the Plaintiff's building; and rarely had a case where the landlord discounted rents; that she didn't understand the concept of *"preferential rent"*; and was having a difficult time getting her arms around the instant bankruptcy case".

367.    On March 19th, 2020 Judge Chapman stated on the record that "she was just not understanding what was going on", with the case and felt the case was "struggling to get out of the gate".

368.    On March 19th, 2020 Judge Chapman told Plaintiff that she longer had the right or authority to rent out any more of the units of her property even though Plaintiff was in the business of renting apartment units.

369.    Judge Chapman asked Plaintiff when unauthorized debits would no longer be reflected in the Debtor in Possession bank accounts.

370.    Plaintiff replied in the second month – meaning two months from April 18th 2020.

371.    Judge Chapman scheduled another status conference on April 28th 2020.  Making it four (4) conferences in four (4) weeks.

48

372.     On April 28th 2020 it was evidenced that the Plaintiff paid herself $3000 from her company's Payroll Debtor In Possession Account.

373.     Judge Chapman was upset that moneys had been used by Plaintiff from the Debtor's estate without a cash collateral budget in place.

374.     On April 28th 2020 Judge Chapman stated on the record that she had received a letter on April 27th 2020 from, Defendant 2386 Hempstead Inc. Counsel, Mr. Ronald Terenzi of Terenzi & Confusione, PC, about certain deficiencies.

375.     Plaintiff never saw Mr. Ronald Terenzi's letter alleging any deficiencies nor was she aware of what the deficiencies were.

376.     Judge Chapman stated that Plaintiff's Counsel had filed the *"deficient"* documents earlier-on that morning – April 28th 2020.

377.     On April 28th 2020 Judge Chapman stated on the record, *sua sponte,* that grounds existed to appoint a Trustee to take over the conduct of the Bankruptcy case because the Plaintiff paid herself funds from the Debtors estate without a cash collateral budget in place and moreover, she felt it would be in the best interest of the estate.

378.     On April 30, 2020, the Bankruptcy Court entered the Order Approving the Appointment of the Chapter 11 Trustee (the "**Order**").

379.     No prior motion(s) for an order to appoint a trustee or an examiner under section 1104(a) or Section 1104(c) of the Code in accordance with Federal Rules of Bankruptcy Procedure Rule 9014 was made.

380.     Under Federal Rules of Bankruptcy Rule 2007.1 Appointment of Trustee or Examiner in a Chapter 11 Reorganization Case: The following procedures were not followed:

      a.   Motion to appoint a Chapter 11 Trustee.

      b.   Request to convene a meeting of creditors for the purpose of electing a trustee was

    c.  Transmission of the request to the United States Trustee in accordance with rule 5005 within the time prescribed by §1104(b) of the Code.

    d.  The election of a trustee under §1104(b) of the Code was not conducted in the manner provided in Rules 2003(b)(3) and 2006.

    e.  No voting proxy was taken pursuant to Rule 2006.

    f.  U.S. Trustee did not notify the Court or file a report stating that the election was disputed.

    g.  U.S. Trustee did not file a report stating the nature of the dispute and listing the name and address of the candidate elected.

    h.  Plaintiff was not given a copy of these reports.

381.    On April 28th, 2020 Plaintiff was immediately removed from operating, managing and earning a living from the income generated by the rental property.

382.    Plaintiff had up to that point, sustained herself and family from the income generated by the property; and has done so for over 20 years.

383.    Without prior notification or hearing Judge Chapman also removed Charles Higgs Esq. from his instruction as Counsel.

384.    This left Plaintiff without the opportunity or means to hire new counsel, as New York, and indeed the entire world were completely shut down due to the Coronavirus Pandemic.

402.    Despite pleadings, Plaintiff was also barred from filing a Disclosure Statement or an Operating Plan directly to the Courts to demonstrate the feasibility of reorganization of her company.

396.    Notably, the Disclosure Statement and Operating Plan was due on May 4th 2020; less than 5 days away.

397.    By removing Charles Higgs as Counsel during the height of the Coronavirus Pandemic,

Plaintiff was denied *inter alia* of her procedural and substantive due process rights.

398.    Plaintiff was denied of her procedural and substantive due process because she was forced to continue the proceedings without counsel and was barred from seeking and retaining new counsel – due to the unprecedented Coronovirus Pandemic.

399.    Never-the-less, Plaintiff was *constitutionally* and *statutorily* entitled to receive notice of her removal from managing her business.

400.    Plaintiff was constitutionally and statutorily entitled to receive notice of her removal because the Plaintiff and her family were financially dependent upon the earnings that her rental units brought in on a monthly basis.

401.    By removing Plaintiff as manager of her property, without proper notice and/or due process, the Bankruptcy Court did not afford Plaintiff *("due process")* before depriving her of her due process *"liberty"* and *"property"* rights.

402.    "Rights, constitutional and otherwise, do not exist in a vacuum.  Their purpose is to protect persons from injuries to particular interest, and their contours are shapes by the interest they protect" *Carey v. Piphus 435 U.S. 247, 254 (1978).*

403.    Violations of those rights therefore "must be considered with reference to the nature of the interests protected by the particular constitutional right in question".

404.    Because the right to procedural due process is 'absolute" in the sense that it does not depend upon the merits of a claimant's substantive assertions, and because of the importance to organize society that procedural due process be observed... Under both the Fifth and Fourteenth Amendments to the U.S. Constitution, neither the federal government nor state governments may deprive any person "of life, liberty, or property without due process of law."

405.    "The due process clause requires that every man shall have the protection of his day in

court, and the benefit of the general law, a law which hears before it condemns, which proceeds not arbitrarily or capriciously, but upon inquiry, and renders judgment only after trial, so that every citizen shall hold his life, liberty, property and immunities under the protection of the general rules which govern society.

406.    It, of course, tends to secure equality of law in the sense that it makes a required minimum of protection for every one's right of life, liberty, and property, which the Congress or the Legislature may not withhold."

407.    Courts have interpreted the due process clauses as providing two distinct limitations on government. First, the clauses provide for procedural due process, which requires the government to follow certain procedures before it deprives a person of life, liberty, or property.

408.    Cases that address procedural due process usually focus on the type of notice that is required of the government or the type of hearing that must be held when the government takes a particular action.

409.    Second, the clauses establish substantive due process, under which courts determine whether the government has sufficient justification for its actions.

410.    Because courts use substantive due process to protect certain fundamental rights of U.S. citizens.  Procedural due process limits the exercise of power by the state and federal governments by requiring that they follow certain procedures in civil matters.

411.    In cases where an individual has claimed a violation of due process rights, courts must determine whether a citizen is being deprived of "life, liberty or property," and what procedural protections were "due" to that individual.

412.    By removing Plaintiff as manager of her property, without proper notice and/or due process, the Bankruptcy Court did not afford Plaintiff ("due process") before depriving her of her

due process liberty and property rights.

413.    On May 8, 2020 Plaintiff filed an Appeal against Judge Chapman's Order appointing a
Chapter 11 Trustee. The instant Appeal is still pending.

403.    On April 30th 2020 Heidi J Sorvino Esq. was appointed as the Chapter 11 Bankruptcy
Trustee.

404.    Plaintiff does not believe the Chapter 11 Trustee Heidi J. Sorvino is a "disinterested
person" as that phase is defined in section 101(14) of the Bankruptcy Code (iii) has connection to,
holds and represents an interest adverse to the Plaintiff, the Plaintiff's Company ("Debtor") and/or
the estate of the Plaintiff.

405.    As will be evidenced in this complaint, Plaintiff believes there to be an undisclosed
"collusive relationship" between Defendant Grodsky and the Chapter 11 Trustee.

414.    Notably, Defendant 2386 Hempstead Inc, which is the secured creditor and lender in the
Bankruptcy case.

414.    Despite the Plaintiff attempts to accommodate and cooperate with Defendant Sorvino, the
relationship with Defendant Sorvino has been adversarial and highly prejudicial from the very
beginning.

415.    On or about May 5th 2020, the Plaintiff telephoned Defendant Sorvino, introduced herself
and inter alia ask how she could be of assistance.

416.    Defendant Sorvino stated that she had been appointed as the Chapter 11 Trustee and needed
certain documents.

417.    Plaintiff requested that Defendant Sorvino put her requests in writing.

418.    On May 5th 2020 Defendant Sorvino made a request to physically come to the property
to collect the checks on May 6th 2020.

419.    Plaintiff was reluctant to give Defendant Sorvino access to the building because of the highly contagious Coronavirus and (2) the State-wide *"Shelter-in-Place"* ordered which was decreed by Governor Mario Cuomo.

420.    Plaintiff told Defendant Sorvino that she did not feel comfortable potentially risking the health and safety of the tenants in her building.

421.    Defendant Sorvino gave assurances that she would only come to collect rent checks and to slip notices under the doors of each apartment.

422.    Defendant Sorvino did not inform the Plaintiff that she would be arriving to the property to search apartments.

423.    Defendant Sorvino did not inform the Plaintiff that she would be arriving to the property to speak directly to the tenants to ask probing questions.

424.    Defendant Sorvino did not inform the Plaintiff that she would be bringing a third-party to the property on May 11th 2020 or may 12th 2020. – Specifically, the secured creditor's President of 2386 Hempstead Inc's Defendant Grodsky.

425.    On May 11th 2020, Defendant Sorvino came to the Plaintiff's premises and introduced Defendant Grodsky.

426.    Notably, this was not the same Defendant Grodsky that Plaintiff met at the 2015 refinance closing.

427.    In fact, Defendant Grodsky confirmed that he had indeed never met Plaintiff either.

428.    This is yet more proof sign of the fraudulent lending scheme that was committed by the Defendants against Plaintiff.

429.    From the onset, it was evident that Defendant Sorvino and Grodsky had a pre-existing personal relationship together.

430.    Plaintiff heard Defendant Sorvino tell Defendant Grodsky *inter alia* that she would "I will get you the most money for the building" "I've been doing this for 30 years", "I'll speak to you outside…".

431.    Defendant Sorvino felt so comfortable with Defendant Grodsky, that she allowed him to act as a *quasi- Ch.11 Trustee- and* harass, intimidate and potentially expose the existing tenants in the building during the height of the Coronavirus Pandemic.

432.    At the building, Defendant Sovino and Grodsky proceeded to knock on all the doors, disturbing the tenants who were home working and following to the *"Shelter-in-place"* mandate.

433.    Defendant Grodsky asked obtrusive and probing questions which he had no right to ask.

434.    Defendant Sorvino did not intervene.

435.    A transcript of the audio recordings have been incorporated in this complaint from paragraph 59 to , (See Exhibit 51: physical disk of the actual audio recordings).

436.    (See Exhibit 62: actual photos taken from the video recordings of the incident.

437.    Defendants Grodsky told Plaintiff that he had a "*right*" to see the premises as the creditor.

438.    Defendant Grodsky told Plaintiff *"I can't wait to own this building"*

439.    Defendant Grodsky told the existing tenants of the building that the *"Judge will probably award me the property and I will be the new owner, so you should cooperate".*

440.    Defendant Grodsky asked several tenants if they had attorneys and moreover told them that they should cooperate to limit the likelihood of being evicted..

441.   With respect to the mortgage scheme Defendant Grodsky even told Plaintiff that "*her*" attorney had colluded with him and brought him the deal!

442.   Another clear violation of "attorney-client privilege".

443.   On May 11th ,2020 Defendant Grodsky and Sorvino attempted to take out mail of the existing tenant's mailbox to determine which apartments were being occupied.

445.   This was done despite the Plaintiff consternation and warning of being a clear Federal violation in doing so.

446.   Defendant Sorvino and Grodsky caused such a disturbance with Plaintiff and her existing tenants that many called frantically and concerned about being evicted that evening.

447.   Eventually, ninety percent (90%) of the tenants vacated the building because of these incidents.

448.   On May 12th 2020 Plaintiff returned to the building to find both Defendant Grodsky and Sorvino at the entrance door of the building with what appeared to be their friend and locksmith about to drill the locks off of the building's public entrance door.

449.   Defendant Sorvino did not inform Plaintiff that she would be returning the following day to search the unoccupied units.

450.   Neither Defendant Sorvino nor Grodsky had search warrants to do so.

451.   Defendants Grodsky and Sorvino started demanding keys to the entrance of the building as well as keys to all of the units of the building.

452.   Defendant Sorvino also wanted to search the unoccupied units of the Plaintiffs' building.

453.   Plaintiff refused because although Defendant Sorvino had been appointed as the Chapter 11 Trustee of the Estate, she did not have a warrant or order from Judge Chapman directing her to search any units or drill off any locks.

454.   This violated Plaintiff Privacy Rights.

455.   Plaintiff keyed opened the entrance door of the building along with Defendant Sorvino and entered inside.

456.   Defendant Grodsky put his foot into the door and prevented Plaintiff from closing the door.

457.   Defendant Grodsky then push through with his locksmith friend, the John Doe 1, and directed him to drill open the locks of the apartments so that Defendant Grodsky could search the contents therein.

458.   Again, neither Defendant Sorvino, Grodsky or his friend had been issued a warrant to do so.

459.   Defendant Sorvino did not intervene.

460.   Defendant Sorvino, Grodsky and Defendant John Doe his locksmith friend committed a crime and This violated Plaintiff Privacy Rights.

461.   In an effort to prevent further damage to the property, the Plaintiff called the police.

462.   Four Police Officers came to the scene. (See Exhibit 52: Names of Police Officers)

463.   Under coercion Plaintiff was forced to allow them to search the units.

464.   Both Defendants Sorvino and Grodsky used "*Gestapo*" like menacing tactics" to intimidate the Plaintiff to give them access to the units.

465.   Defendants Sorvino and Grodsky, did not have a legal right to drill open any locks.

466.   Defendants Sorvino and Grodsky were not given unrestricted access to enter the Plaintiff's private property and drill the locks off the doors at will.

467.   This violated Plaintiff Privacy Rights and also violated the Plaintiff's Constitutional Fourth, Sixth and Fourteenth Amendment of the Constitution.

468.   It is illegal to drill locks off doors without a search warrant or an order from a Judge.

469.   However, that's exactly what Defendants Godsky and Sorvino did.

470.   Defendant ordered his locksmith friend John Doe (1) to drill the locks off of private property which he did not have a warrant or order from the Courts to do so, and Defendant did not intervene to stop him.

471.   Defendant Sorvino used her power as Chapter 11 Trustee to enter onto private property unannounced, without a warrant or order from the courts to drill off locks and search the premises.

472.   This was done under the color of law.

473.   Notably, even police officers cannot enter a dwelling without a warrant and start drilling off locks.

474.   The Fourth Amendment preserves the "right of the people to be secure in their persons, houses, apartment without limiting threats or right to one.

475.   The Constitutional and the Bill of Rights were written to protect the people from the government, not to protect the government from the people. And within those documents, the people have the constitutional right to hold the government accountable when it does deny its citizens their right under the law, even if it's the federal government.

476.   Even Court appointed Trustees are not immune to forcing entry into an apartment or home without a search warrant.

477.   However, that is what Defendants Sorvino and Grodsky did.

478.   This is an abuse of power and abuse of process.

479.    This has injured the Plaintiff because her rights to privacy have been violated and as such Plaintiff no longer feels safe and secure living in her property and feels constantly threaten by the possibility of retaliation by the Defendants by exposing their unlawful actions.  Coming at any moment, under the color of law to illegally remove her from her property.

480.    Indeed, Defendant Sorvino has used her power and position to misrepresent the facts to the Bankruptcy Courts and paint Plaintiff as a fraud, liar and thief because she has a different agenda.

481.    This is an obvious tactic to deflect from the true issues at hand.

482.    On or about June 6th 2020, Plaintiff was deposed by White and Williams to answer question with respect to the Debtor pursuant 204 Bankruptcy Examination.

483.    Plaintiff was deposed on June 6 2020 and August 26th 2020.

484.    Plaintiff spent over thirteen hours being deposed.

485.    This is a violation of the FRBP as it is six hours beyond that required by law.

486.    As a result of the deposition Plaintiff was required to file certain items with respect to the estate.  (See Exhibit 85: Turnover Estate Order)

487.    Plaintiff filed items electronically.  (See Exhibit 65: transmission of emails sent to Defendant Sorvino.

488.    Yet Defendant Sorvino told the Bankruptcy Courts that Plaintiff had not complied with Judge Chapman's turnover order and filed a motion for Contempt of Court.  (See Exhibit 66: Turnover items).

489.    As a result of Defendants misrepresentation, Plaintiff was held in Contempt of Court.

490.    Plaintiff was also sanctioned two-hundred dollars a day until the alleged items were turned over.

491.   Plaintiff stated, inter alia, that her Rights to Privacy and other Constitutional Rights were being violated.

492.   Indeed, throughout the bankruptcy proceedings Plaintiff First Amendment Right to Free Speech was often violated.

493.   Plaintiff was compelled to released keys to her property.

494.   Defendants Sorvino and Grodsky, infringed upon Plaintiffs Constitutional Rights as a citizen of the United States

495.   Defendants Sorvino and Grodsky infringed upon the Tenants of 60 West 91 $^{st}$ Street Constitutional Rights as citizen of the United States.

496.   Plaintiff turned over the items which were directed by Judge Chapman on May 28th 2020.

497.   Plaintiff emailed items to Defendant Sorvino and her Counsel White and Williams. (See Exhibit 65: confirmation of emails re: compliance).

498.   This is contrary to Defendants Sorvino's motion for Contempt of Court against Plaintiff to the Court.  (See Exhibit 67:  Defendant Sorvinos Motion).

499.   This was a malicious abuse of power. Defendant Sorvino had represented to the Courts that Plaintiff had not complied with the Judges Turnover Directive when in fact she had.


**INCIDENT OF MAY 11TH 2020 WITH DEFENDANTS SORVINO AND GRODSKY AND PLAINTIFF AT PLAINTIFF'S PROPERTY**

**May 11th 2020 1:34 PM DURATION _____**


**PARTIES:**

415.   Defendant Scott Grodsky (**"GRODSKY"**)

416.   Defendant– Heidi J Sorvino (**"SORVINO"**)

417.  Plaintiff- Kim Mortimer (**"PLAINTIFF"**)

418.  Tenants (1) (2) (3) (4) (5) – **"Tenants (1) (2) (3) (4) (5)"** respectively

419.  Witness (1) – **("WITNESS 1**

## *RELEVANT STATEMENTS MADE BY DEFENDANT GRODSKY*

*"She has a lot of say with the Judge! You really should be cooperating with her".*

*"Talk to your friend.  If she would cooperate, I can guarantee you it would benefit her, not be hostile.  She (Sorvino) has a lot of influence over the judge and the Court.  By not cooperating The Judge is not going to be happy about it".*

*"Why don't you just talk to the judge and say she's not cooperating and that's it".*

*"Switched the documents, I haven't touched the documents.  I never even met you".*

404.  **PLAINTIFF:** Hi Ms. Sorvino.  How are you?

405.  **DEFENDANT SORVINO:** Ms. Mortimer. Hi Ms. Mortimer.  How are you?

406.  **DEFENDANT GRODSKY:** I'm OK. Umm, you didn't say you'd be coming with someone, so it's only going to be you.  I don't know who this person is.

407.  **PLAINTIFF:** This is Scott Grodsky.

408.  **DEFENDANT SORVINO:** OH! Oh.  That's Scott Grodsky?

409.  **DEFENDANT GRODSKY:** Yeah that's me.  I am allowed to be here.

410.  **PLAINTIFF:** Oh wow!  OK.

411.  **DEFENDANT SORVINO:** He is allowed to be here.

412.  **DEFENDANT GRODSKY:** I have all the right under the lease, under the mortgage note.

413.  **PLAINTIFF:** The corrupt uh lender

414.  **DEFENDANT GRODSKY:** Yes. The corrupt lender.

415.   **DEFENDANT SORVINO:** So I am trying to figure out based on this what you've sent me in Bankruptcy Court

416.   **PLAINTIFF:** Sorry I don't want to get so close to you

417.   **DEFENDANT SORVINO:** That's OK.   I am trying to compare with what's on the mailbox name, and I need to inspect the building.

418.   **PLAINTIFF:** OK. Why you're here, I need to give you these which is why you are here

419.   **DEFENDANT SORVINO:** Well I am here for a lot of different reasons, not just the rent checks.

420.   **PLAINTIFF:** Well, unfortunately, what we've agreed to was that you were going to pick up the rent checks -- which you now have.

421.   **DEFENDANT SORVINO:** Yeah

422.   **PLAINTIFF:** And you would leave whatever you need to leave with the tenants – which you can, in terms of notices.

423.   **DEFENDANT SORVINO:** I want to get into that vacant apartments.

424.   **PLAINTIFF:** Well we can't do that today.

425.   **DEFENDANT SORVINO:** Why not?

426.   **PLAINTIFF:** Because I don't, I wasn't prepared for it.

427.   **DEFENDANT SORVINO:** You don't have to be prepared for it.

428.   **PLAINTIFF:** Yes, I do need to be prepared for it.

429.   **DEFENDANT GRODSKY:** She's the bankruptcy attorney.  As the Lender, I also have right under the mortgage to enter the places

430.   **PLAINTIFF:** I am sorry.  I am sorry.  Well she didn't, unfortunately, Ms. Sorvino didn't

431.   **DEFENDANT SORVINO:** Doesn't matter.  Can I have the rent checks?  That's number one.

432.   **PLAINTIFF:** Absolutely.

433.   **DEFENDANT SORVINO:** I will let you know where to transfer what you are holding.

434.   **PLAINTIFF:** I need some information from you.  I need it in writing, and so we can go from there.  You could leave the messages if you choose, but at this point in time, as I said, that's not what we've discussed, and I don't appreciate it…

435.   **DEFENDANT GRODSKY:** You do have a legal right to be here and enter the place without notice, is that right?

436.   **DEFENDANT SORVINO:** Oh my God.

437.   **DEFENDANT GRODSKY:** And I have a right to be here.

438.   **PLAINTIFF:** There is a moratorium here and right now you are breaking the law.

439.   **DEFENDANT SORVINO:** We are really not breaking the law.

440.   **DEFENDANT GRODSKY:** She is the law.

441.   **PLAINTIFF:** No.  She… There is a Moratorium OK?

442.   **DEFENDANT GRODSKY:** Moratorium on what?

443.   **PLAINTIFF:** Moratorium is that nothing goes forward OK?

444.   **DEFENDANT GRODSKY:** That's that's in the Courts.  It has nothing to do with getting into a building and nothing to do with us.  Otherwise, you couldn't be here and nobody else could be here.

445.   **PLAINTIFF:** No. I am the owner.

446.   **DEFENDANT GRODSKY:** OK. There are 9 units in the building, correct?

447.   **PLAINTIFF:** That is correct

448.   **DEFENDANT GRODSKY:** How many are legal rent stabilized or rent controlled.

449.   **PLAINTIFF:** None of them, except for one.

450.   **DEFENDANT SORVINO:** Legally?

451.   **DEFENDANT GRODSKY:** Legally

452.   **DEFENDANT GRODSKY:** So they are not rent stabilized, or rent control except one.

453.   **PLAINTIFF:** And and, I am not even speaking to you because as far as I

am concerned you did fraudulent manipulations with the mortgage note.

454.   **DEFENDANT GRODSKY:** Can I just say something,

455.   **PLAINTIFF:** You could say whatever you want to say.

456.   **DEFENDANT GRODSKY:** Here's the point. You can either be nice and cooperate...

457.   **PLAINTIFF:** I am being cooperative.

458.   **DEFENDANT GRODSKY:** It would probably do better for you, because this is not a

matter of personal... I am just saying it would help you financially.

459.   **PLAINTIFF:** You haven't help me yet.

460.   **DEFENDANT GRODSKY:** I haven't done anything.

461.   **PLAINTIFF:** Yeah you have!  You've illegally, you've illegally.

462.   **DEFENDANT SORVINO:** Who is this the mailman?  I want to know how many

apartments he is putting rent in.

463.   **DEFENDANT GRODSKY:** It's the mailman.  Ok.  We'll see.

464.   **PLAINTIFF:** Can you move back?  Can you move back?

465.   **DEFENDANT GRODSKY:** If you want to leave notes you could put it in the mailbox

here.

466.   **DEFENDANT SORVINO:** I will put it under their doors.

467.   **DEFENDANT GRODSKY:** Alright.

468.   **PLAINTIFF:** I am sorry.  This is private property.  You don't have the right to look in someone's mailbox.

469.   **DEFENDANT SORVINO:** I am not looking in.  I am the bankruptcy trustee.  I am allowed to take a picture.

470.   **DEFENDANT GRODSKY:** We absolutely have the right!

471.   **PLAINTIFF:** No you don't.  That's Federal.

472.   **DEFENDANT SORVINO:** I am not looking in their mailbox.  I am taking a picture.

473.   **PLAINTIFF:** No I am not talking about taking a picture, I am talking about looking into people's private mailbox. HE IS! You know what?  OK.  That's it.  Actually, it is.  It's private property.

474.   **DEFENDANT GRODSKY:** No no no.

475.   **DEFENDANT SORVINO:** I want to see how many he is putting in.  Is there only five?

476.   **POSTMAN:** Yes.

477.   **DEFENDANT SORVINO:** Thank you

478.   **PLAINTIFF:** Which is what I said.

479.   **DEFENDANT SORVINO:** This is what I need to know.

480.   **DEFENDANT GRODSKY:** Uh, the 899 check.  Why is that?  Why is that 899 and not 2000.

481.   **PLAINTIFF:** OK.  I'm not, I'm not letting you do anything else.  We decided, you didn't comply with.  You were supposed to…

482.   **DEFENDANT SORVINO:** Number one.  You don't make the rules. Number one. You really don't

483.   **PLAINTIFF:** Well, actually, I do until it's sold.

484.   **DEFENDANT SORVINO:** Number 2.  You filed this with the Court, yet you've sent me five leases and I've asked you

485.   **PLAINTIFF:** And I have already told you.  If you look at them, they say for March.  These are retroactive.  OK?  It's a month out.

486.   **DEFENDANT SORVINO:** I understand that.  That's why I asked you.

487.   **PLAINTIFF:** And I told you when you asked me the first time, I ended up leasing two other apartments which was my right

488.   **DEFENDANT GRODSKY:** Since that point?

489.   **PLAINTIFF:** Since that point

490.   **DEFENDANT SORVINO:** But I don't know when.

491.   **DEFENDANT GRODSKY:** The other thing is, I don't know if has the right to enter into leases.

492.   **DEFENDANT SORVINO:** I became the Trustee on April 30th.  Now she has no right to do anything.  But before that time she did.

493.   **DEFENDANT GRODSKY:** OK.

494.   **DEFENDANT GRODSKY:** The 899 check, what why is this 899 and the others more money?  I am just curious.

495.   **DEFENDANT SORVINO:** Because it must be rent stabilized

496.   **DEFENDANT GRODSKY:** Is that the rent stabilized one?

497.   **PLAINTIFF:** I am not speaking to you.

498.   **DEFENDANT SORVINO:** I am going to walk around.

499.   **DEFENDANT GRODSKY:** OK.

500.   **PLAINTIFF:** You could walk around.  As far as I am concerned you can put the notices under the door, OK, and that is the extent to what I am prepared to do today, because that is what you told me you were going to do.

501.   **DEFENDANT SORVINO:** Right.  But remember I also asked you for a key and you said you were not sure if you could give one to me?

502.   **PLAINTIFF:** No I told you from the very beginning that you weren't getting a key.  You know why?

503.   **DEFENDANT SORVINO:**  OK fine. Right now according to this you have four empty apartments.  I want to go into the empty apartments.

504.   **PLAINTIFF:** That cannot be done today.

505.   **DEFENDANT GRODSKY:** You want to get a locksmith?

506.   **DEFENDANT SORVINO:** I could get a locksmith.

507.   **PLAINTIFF:** Go go right ahead, and you'll be arrested.

508.   **DEFENDANT GRODSKY:** I really think you should do that because they might be furnished, they might be furnished, they might be, might be,

509.   **PLAINTIFF:** There is no order.  There is a (shelter in place) Moratorium right now.

510.   **DEFENDANT SORVINO:** Really?

511.   **DEFENDANT GRODSKY:** I am going to get a lock smith

512.   **DEFENDANT SORVINO:** I am going to go upstairs.  This is her apartment.

513.   **DEFENDANT GRODSKY:** You can't go into the apartments is that what you're saying?

514.   **DEFENDANT SORVINO:** Yes. That's what she is saying.

515.   **PLAINTIFF:** Not today.

516.   **DEFENDANT GRODSKY:** I am going to call a locksmith now.

517.   **DEFENDANT SORVINO:** But the problem is they are not numbered.  I am gonna go look.

518.   **DEFENDANT GRODSKY:** Well, as as the uh bank.  As the lender I am allowed to search these places.

519.   **DEFENDANT SORVINO:** I know you are.. I don't know why they are not numbered.

520.   **DEFENDANT GRODSKY:** That's your apartment downstairs, yours?

521.   **PLAINTIFF:** You are not going to put any notices on there.

522.   **DEFENDANT SORVINO:** Well, I don't know how they are numbered.

523.   **DEFENDANT GRODSKY:** Is this one occupied?

524.   **PLAINTIFF:**  1-9.  Just put them under the door.

525.   **DEFENDANT SORVINO:** No.  I need to know where unit 1 is.

526.   **DEFENDANT GRODSKY:** Heidi is this one occupied?

527.   **PLAINTIFF:** Unit 1 is downstairs. Do you have notices or not?  Put them under the door.

528.   **DEFENDANT SORVINO** Excuse me I have nine notices.  Unit 1 is where?

529.   **PLAINTIFF:** Unit one is downstairs.

530.   **DEFENDANT SORVINO:** OK.  Then 9 must be up at the top.

531.   **DEFENDANT SORVINO:** I am going all the way to the top.

532.   **DEFENDANT GRODSKY:** It's probably in your best to be, in your interest to cooperate.

533.   **PLAINTIFF:** I am cooperating with her.

534.   **DEFENDANT GRODSKY:** No you are not really.

535.   **PLAINTIFF:** I am not cooperating with YOU.

536.   **DEFENDANT GRODSKY:** Not really.  What's the problem with getting into the empty apartments?  Why don't you let me call a locksmith right now!  I will pay for the locksmith.  We

68

have to get into these apartments to see the reality of the apartments because they might be being rented.

537.   **DEFENDANT SORVINO:** That's what I'm worried about.

538.   **PLAINTIFF:** No. No. As I told you they are not being rented.

539.   **DEFENDANT SORVINO:** Are they Air BNB?

540.   **PLAINTIFF:** No.

541.   **DEFENDANT SORVINO:** Are they VRBO?

542.   **PLAINTIFF:** No.  You asked me that.  What did I tell you when you asked me the last time?

543.   **DEFENDANT SORVINO:** So you have 4 vacant apartments.

544.   **DEFENDANT GRODSKY: She has a lot of say with the Judge! You really should be cooperating with her.**

545.   **PLAINTIFF:** I am cooperating with her dear.  I am not cooperating with YOU because you are crooked.  Oh no no no.  You baited and switched the closing documents.

546.   **DEFENDANT GRODSKY:** You tried to get your lawyer disbarred.

547.   **PLAINTIFF:** What? Which lawyer was that?

548.   **DEFENDANT SORVINO:** Oh.  This says number 9. I feel so much better.

549.   **DEFENDANT GRODSKY:** I want to see if the roof is ok.  If it has a leak.

### TENANT INTERRUPTIONS

550.   **DEFENDANT SORVINO:** Hi, my name is Heidi Sorvino.  I have been appointed by the CH. 11 Bankruptcy Trusted for this building.

551.   **TENANT:** OK.  How are you.

552.   **DEFENDANT SORVINO:** I came to hand you this notice.

553.   **TENANT:** OK.

554.   **DEFENDANT SORVINO:**  Um. How long have you been renting here?

555.   **TENANT:** I been here for almost two months

556.   **DEFENDANT GRODSKY:** 2 months?  You just moved in?

557.   **TENANT 1:**  Yeah.

558.   **DEFENDANT SORVINO:** OK.

559.   **DEFENDANT GRODSKY:** What are you paying for rent.

560.   **TENANT:** I am really sorry.  I am in the middle of something.  I would like to contact my attorney.

561.   No. No. No. It's important.  It's not a big deal. Just tell me what you're paying!

562.   **DEFENDANT SORVINO:** Excuse me.  I am the Trustee.  You can see my appointment.

563.   **TENANT:** I don't know who you are, I am in the middle of something.

564.   **DEFENDANT GRODSKY:** She's the landlord. She's standing right there.

565.   **PLAINTIFF:** Don't answer.  They could give it to you in writing. Let them put it in writing.

566.   **DEFENDANT GRODSKY:** Do you have a lease?  We want to make sure the lease is valid.  That's all.

567.   **DEFENDANT TENANT:** I am just saying, I don't know you I am sorry.

568.   **DEFENDANT SORVINO:** I know you don't know me.

569.   **DEFENDANT GRODSKY:** The Landlord is standing right there.

570.   **PLAINTIFF:** No. But I say he's not to speak to you (Grodsky)

571.   **DEFENDANT GRODSKY:** You're telling him not to speak to me?

572.   **PLAINTIFF:** Yeah. He is the crooked lender

573.   **DEFENDANT GRODSKY:** Listen to me.  There is a good chance I am going to wind up getting the property in bankruptcy Court.  She could say whatever she wants.  Do you know the next door neighbors?

574.   **TENANT:**  I don't know anyone here.  I am going to be fair with you.  I am not to listen to you, not to her.

575.   **DEFENDANT GRODSKY:** She was appointed by the judge.  We want to keep everybody here.  All I am saying

576.   **DEFENDANT SORVINO:**  I apologize, I work from home.  This is part of my job for interrupting you.

577.   **PLAINTIFF:** Hey WITNESS 1.  Where are you?  We have an issue here.

578.   **DEFENDANT SORVINO:**  All of my information is in there.  I am all dressed up sir, you don't know who I am.  Everything is in there.

579.   **PLAINTIFF:** WITNESS 1.  Come quickly.

580.   **DEFENDANT SORVINO:** Hi.  My name is Heidi Sorvino.  I've been appointed as Chapter 11 Trustee for the building.

581.   **TENANT 2:** Thank you.

582.   **DEFENDANT SORVINO:**  I am here to just check the building.  Do you have a lease here?

583.   **TENANT 2:** Yes.

584.   **DEFENDANT GRODSKY:** How long have you been living here?

585.   **DEFENDANT SORVINO:** Can you give me your name?

586.   **TENANT 2:** Marie Goetske – M-a-r-i-e  G-o-e-t-z-k-e.

587.   **DEFENDANT GRODSKY:** Thank you so much.  When does your lease expire?

588.   **PLAINTIFF:** September 11th.

589.   **DEFENDANT SORVINO:** Thank you so much.

590.   **DEFENDANT GRODSKY:** It's a 1 year lease?

591.   **TENANT 2:** Yes,

592.   **DEFENDANT GRODSKY:** Did you just pay?

593.   **DEFENDANT SORVINO:** Scott please.  Scott please.  I want to see what's going on...

594.   **PLAINTIFF:** Hey WITNESS 1.  Hey WITNESS 1.  Are you downstairs?

595.   **DEFENDANT SORVINO:** Thank you so much.  You have all the information is in there

596.   **PLAINTIFF:** I can't hear you.  Are you outside?  Alright – She has two people here and the lender is actually here too.  Scott Grodsky.

597.   **DEFENDANT SORVINO:** He's allowed to be here.  So Unit 7.

598.   **DEFENDANT GRODSKY: By the way.  Her attorney brought me the deal.  Ha. Ha. I didn't go after her.  Her attorney brought the deal to lend money.**

599.   **PLAINTIFF:** That's why the judge has ruled...

600.   **DEFENDANT GRODSKY:** Is there somebody in there?  Is it occupied?  Hello?

601.   **PLAINTIFF:** I had many attorneys.  Which one?

602.   **DEFENDANT SORVINO:** Hi.  I am the bankruptcy attorney.  I need to hand you something.

603.   **DEFENDANT GRODSKY:** We are here with Mrs. Mortimer.

604.   **PLAINTIFF:** No.  Ms. Mortimer is not here for support. Mrs. Mortimer is just making sure they're doing what they are supposed to do?

605.   **TENANT 3:** Whatever you have you'll need to slide it underneath the door.

606.   **DEFENDANT SORVINO:** That's fine. I have no problem with sliding it under the door. That's OK. Can I have your name?

607.   **TENANT (3):** Paulette Brown

608.   **DEFENDANT SORVINO:** Paulette Brown?

609.   **TENANT (3):** Yes.

610.   **DEFENDANT GRODSKY:** Thank you.

611.   **DEFENDANT SORVINO:** Thank you very much Miss Brown.

612.   **DEFENDANT GRODSKY: (Knocking on the door)** Hello? Hello?

613.   **DEFENDANT SORVINO:** Hello?

614.   **TENANT (4):** How are you?

615.   **DEFENDANT SORVINO:** Hi Sir. How are you? My name is Heidi Sorvino. I am a bankruptcy lawyer. I've been appointed as the bankruptcy trustee for the building. I need you to take this document and read it, if you have any question, all my information is in there.

616.   **DEFENDANT GRODSKY:** It doesn't jeopardize you lease in any way.

617.   **DEFENDANT SORVINO:** No. Nothing like that. I just have to do this. Can I have you name?

618.   **TENANT (4):** Mike Hobson.

619.   **DEFENDANT SORVINO:** When does your lease expire?

620.   **DEFENDANT GRODSKY:** September um?

621.   **DEFENDANT SORVINO:** That's OK. How long have you been here.

622.   **DEFENDANT GRODSKY:** Two years

623.   **DEFENDANT SORVINO:** Thank you.

624.   **DEFENDANT GRODSKY:** How many has that been so far? Is this one empty?

625.  **DEFENDANT SORVINO:** We've been in five apartments.

626.  **DEFENDANT GRODSKY:** Is this one empty?

627.  **PLAINTIFF:** Just slip it under the door.

628.  **DEFENDANT SORVINO:** It's a question. Is this one empty?

629.  **PLAINTIFF:** Slip it under the door.  Next time you should tell beforehand of your plans so I can be prepared.

630.  **DEFENDANT SORVINO:** Can you stop with your nonsense.  I don't have to ask you to do anything.  I've done nothing wrong.  I am trying to do my job.

631.  **PLAINTIFF:** It's not nonsense.

632.  **DEFENDANT SORVINO:** I don't have to tell you everything that I do in advance.

633.  **PLAINTIFF:** I am kind of tired of your nonsense.

634.  **DEFENDANT GRODSKY:** I can get a locksmith.  Let's get a locksmith.

635.  **DEFENDANT SORVINO:** We may need to get one in order to get into the empty units

636.  **PLAINTIFF:** Yes, you do, especially if it's to search and enter apartments the building. I am trying to work with you.

637.  **DEFENDANT GRODSKY**: You're not trying to work with her.

638.  **PLAINTIFF**: Well you can say whatever you want to say.

639.  **TENANT (5):** Hello.  Who is it? I am sorry.  I am seeing patients right now.

640.  **DEFENDANT SORVINO**: Hi.  I am so sorry.  I am the Bankruptcy Trustee.  I need to hand this to you, and just need to…

641.  **TENANT (5):** Sorry? Who are you?

642.  **DEFENDANT SORVINO:** I am an attorney in NYC.  I was appointed by the BK Court

643.  **TENANT (5):** I am sorry. I am in the middle of seeing my patients.

644.   **DEFENDANT SORVINO:** Just give us your name.  Just give me your name.

645.   **TENANT (5):** I am sorry. I am busy.

646.   **DEFENDANT GRODSKY**: Just give us your last name.  Don't want to just give us your last name?  She was appointed by the courts.  We just need your last name.

647.   **DEFENDANT SORVINO:** Mrs. Mortimer is right here.

648.   **PLAINTIFF:** It doesn't mean I am approving of these actions.  That's the crooked lender.

649.   **DEFENDANT GRODSKY:** She has been appointed by the Court.

650.   **TENANT (5):** Ok. Ok.

651.   **DEFENDANT SORVINO:** I understand you have patients.  I come from a family of doctors.  I just need your name doctor.

652.   **DEFENDANT GRODSKY:** I am trying to keep the tenants here.  I am trying to keep the tenants here.

653.   **TENANT (5):** Ok. Ok. Let me finish with my patients, then we can talk.

654.   **DEFENDANT SORVINO:** Thank you so much.

655.   **DEFENDANT GRODSKY:** What number is that?

656.   **DEFENDANT SORVINO:** This is 2.

657.   **DEFENDANT GRODSKY:** That was three.

658.   **DEFENDANT SORVINO:** Yes

659.   **DEFENDANT GRODSKY:** So how many people, add up?

660.   **DEFENDANT SORVINO:** 1,2,3…

661.   **DEFENDANT GRODSKY:** Is she a doctor here?

662.   **DEFENDANT SORVINO:** Yes.

663.   **DEFENDANT GRODSKY:** Tenants treating patient?  I think, I think you need a permit to do that.  I bet you need a permit to do it in your house.  We'll have to see about that.

664.   **DEFENDANT SORVINO:** This is for you.  I have to give it to everyone.

665.   **DEFENDANT GRODSKY:** How many people?

666.   **DEFENDANT SORVINO:** I will tell you outside everything.

667.   **PLAINTIFF:**  Did she tell you her name?

668.   **DEFENDANT GRODSKY:** Why don't you tell us her name?  What's the difference?  It's not going to win points by not giving people's names.

669.   **DEFENDANT GRODSKY**:  Ha ha ha.  I probably could have helped you.

670.   **PLAINTIFF:** No. I don't think so.  You have "unclean" hands

671.   **DEFENDANT GRODSKY:** I know a lot of people.  I know a lot of wealthy people.

672.   **PLAINTIFF**: No.  That's fine.

673.   **DEFENDANT SORVINO:** So you have 9 units.  No one is in 7 and 2.  You live in one. So by my count 5 are being rented.

674.   **PLAINTIFF:** Which is what I said.

675.   **DEFENDANT SORVINO:**  So you should be getting 6 rent checks, not 5.

676.   **PLAINTIFF:** No.  You have **5** rents as I said.

677.   **DEFENDANT SORVINO:** And right now you have to start paying rent now.

678.   **PLAINTIFF:** OK.  Well do what you have to do.

679.   **DEFENDANT SORVINO:** I am sorry?

680.   **PLAINTIFF**: I said do what you have to do.

681.   **DEFENDANT SORVINO:** Well, I would like to see how large your apartment is.

682.   **DEFENDANT GRODSKY:** I cant believe you cant get into these apartments. This is crazy. You don't know how much they are paying rent.

683.   **PLAINTIFF**: I gave you how much they are paying in rent.

### ENTER WITNESS

684.   **PLAINTIFF**: She is making an issue. She said she wants to search inside the apartments, but she never told me that she needed or wanted to do that. If she had told me that she wanted to go inside them I would have made arrangements for her to do so. He is also threatening to break the locks.

685.   **DEFENDANT SORVINO:** Who are you? Who are you? I am Heidi Sorvino. I am the bankruptcy attorney. What is your relationship to Ms. Mortimer?

686.   **PLAINTIFF:** If she wants to tell you, let her tell you.

687.   **DEFENDANT SORVINO:** OK. Don't tell me.

688.   **DEFENDANT GRODSKY:** <u>Talk to your friend. If she would cooperate, I can guarantee you it would benefit her, not be hostile. She (Sorvino) has a lot of influence over the judge and the Court. By not cooperating the judge is not going to be happy about it.</u>

689.   **PLAINTIFF:** Well if she tells the judge that I am not cooperating, she would be lying cause I've been very cooperative

690.   **DEFENDANT GRODSKY**: You're not letting her in.

691.   **PLAINTIFF**: No. I am not letting YOU in. I am not letting her in now because she didn't tell me that she needs to go in and search each unit.

692.   **DEFENDANT GRODSKY:** I am pretty sure if you read the mortgage documents you would know that I have a right to be here.

693.   **PLAINTIFF:** Well you actually baited and switched the documents so, so much for that.

694.   **DEFENDANT GRODSKY:** <u>Switched the documents, I haven't touched the</u> <u>documents.  I never even met you.</u>

695.   **PLAINTIFF:** Yeah OK.  Well that's even worse

696.   **DEFENDANT GRODSKY:** I foresee this not going well for you because you don't want to be nice about it and cooperated.  I don't see it going well for you.  <u>Why don't you just</u> <u>talk to the judge and say she's not cooperating and that's it.</u>

697.   **DEFENDANT SORVINO**: She's videotaping it.

698.   **DEFENDANT GRODSKY**: It's OK if she is videotaping it.

699.   **PLAINTIFF**: Humm…


**INCIDENT OF MAY 12TH 2020 WITH DEFENDANT HEIDI SORVINO AND SCOTT GRODSKY AND PLAINTIFF MORTIMER ALSO FROM THE 24TH PCT. OFFICER FERGERSON #15633, OFFICER PAULKETT #15093, OFFICER RICHARDSON, AND LT. BOWLS.**

**<u>May 12th 2020 1:34 PM DURATION 17:03</u>**


**(DRILLING SOUND) 12 SECONDS**

700.   **PLAINTIFF:** Sir? Umm, as I said.

701.   **DEFENDANT SORVINO:**  And uh, she called the police.

702.   **DEFENDANT GRODSKY:**

703.   **911 EMERGENCY OPERATOR:** Hello?

704.   **PLAINTIFF:** Are you here.

705.   **911 EMERGENCY OPERATOR** The police are responding.  Help is on the way.

706.   **PLAINTIFF:** Thank you.

707. **DEFENDANT SORVINO:** I am a little jealous to be honest with you.  I admit. I have to be honest with you.

708. **PLAINTIFF:** Sorry What's the name of your locksmith?

709. **DEFENDANT GRODSKY:** You don't have to tell her you don't work for her.  Just go on!

710. **DEFENDANT SORVINO:**  Well alright.

711. **PLAINTIFF:**  Well I suggest you don't. OK.

712. **DEFENDANT GRODSKY:** Ignore what she is saying. (Unintelligible)

713. **DEFENDANT SORVINO:** OK.

714. **PLAINTIFF:**  Yeah.  We know that cause you're so corrupt.

715. **DEFENDANT GRODSKY:** (Unintelligible).    That's the front door.  That's the main problem.

716. **DEFENDANT SORVINO:**  I still need the keys.

717. **DEFENDANT GRODSKY:** She doesn't want to do that.  We'll have to drill them all off. (Unintelligible). Every time I have ever done this, I've told the police ahead of time.

718. **DEFENDANT SORVINO:** That's fine/

719. **DEFENDANT GRODSKY:** I understand the uncomfortable position that you're in…

720. **DEFENDANT SORVINO:**  I am trying to be nice. I am trying to work this out…

721. **DEFENDANT GRODSKY:** You've been awfully nice!

722. **DEFENDANT GRODSKY:** Just ignore what she says. OK. I wouldn't let. I, I…

723. **PLAINTIFF:** Hey Solange. They're actually here drilling off the locks!

724. **PLAINTIFF's SISTER:** What?

725. **PLAINTIFF:** Yeah. I called the police. Can you come?

726. **PLAINTIFF SISTER:** I am down there. What time. What time. They're there now?

727.   **PLAINTIFF:** They are here now.   Well the police are coming; they're on their way. Actually, he has a locksmith, and uh Heidi and Scott...

728.   **(SOUND OF DRILLING 5 SECONDS)**

729.   **PLAINTIF's SISTER:** Call Sedgwick to come downstairs.

730.   **PLAINTIFF:** Yeah. I did.

731.   **PLAINTIF's SISTER:** Call Sedgwick and I will try to make it back.

732.   **PLAINTIFF: OK.**

733.   **PLAINTIFF's SISTER:** OK. Bye.

734.   **(DRILLING SOUND) 5 SECONDS**

**ENTER THE POLICE**

735.   **PLAINTIFF:** We're up here. I am sorry sir.  You're going to need to stop.

736.   **POLICE:** Hi. You want to come down here?

737.   **PLAINTIFF:** Yup.  Yeah.

738.   **DEFENDANT SORVINO:**   My name is Heidi Sorvino. I am a partner of White and Williams.  I can show you my attorney card.

739.   **PLAINTIFF:** I am the owner.

740.   **POLICE:** OK.  What's going on?

741.   **DEFENDANT SORVINO:** (unintelligible) I am going to give you the background.

742.   **POLICE:** Let her talk first and then you.

743.   **DEFENDANT SORVINO:** This building is in bankruptcy. The building in CH. 11 bankruptcy pursuant to an order of Judge Chapman.  I have been appointed as the CH. 11 Trustee. Pursuant to the Steps into the shoes of the debtor.  Let me show you my attorney card. That I am doing everything in the proper power.  I can also give you my business card.  Oh.  I am sorry that was my driver's license. I am admitted in the State of New York.

744.   **POLICE:** OK…

745.   **DEFENDANT SORVINO:** I am also Federally Admitted.  I have been practicing for 31 years.  Umm.  I have an order from the Court.  We can call Judge Chapman's Chambers, if you want.

746.   **PLAINTIFF:** Uh huh.

747.   **POLICE:** OK.  So what are we doing here today?  Change the locks?

748.   **DEFENDANT SORVINO:** So, I asked her nicely yesterday.  I need access to the building because now this entire building and the tenants are under my purview and my management.

749.   **PLAINTIFF:** MANAGEMENT!

750.   **DEFENDANT SORVINO:** Because if anything happens it becomes my responsibility.  I need access.  She refused to give me the keys, She told me certain, and I have all email to this effect.  She refused to give me keys and she refused to give me access to the unoccupied apartments.  It is my duty to see if there is Air BNB going on.  VRBO.  Because everything I do.

751.   **POLICE:** Are they the unoccupied ones.

752.   **DEFENDANT SORVINO:** Yes. Because I knocked on every door.  I spoke to all the tenants. And gave them the new. Because I also

753.   **DEFENDANT GRODSKY:** We could be out of here in 5 minutes if she would just open the door and let us in. We'd be out of here.

754.   **DEFENDANT SORVINO:** Scott stop. So, I um am just trying to show you other notices that we had to do pursuant to Court Order.  So.  I brought everything.  OK.  That we have to do pursuant to Court Order.  OK. So, I have to do all of this.  Look at the unoccupied apartments. Give the tenants new information.

755.   **DEFENDANT GRODSKY:** She did yesterday.

756.   **PLAINTIFF:** She did that yesterday.

757.   **DEFENDANT SORVINO:**  So I knocked on the door.

758.   **POLICE:**  For the tenants that are occupied.

759.   **DEFENDANT SORVINO:**  I had to put it under every door pursuant to my court appointment.  Which I did yesterday. Ms. Mortimer, even though I am the CH. 11 Trustee, refused to give me keys to the building so I can come and go as per my duty.

760.   **POLICE:** Uh huh.

761.   **DEFENDANT SORVINO:**  And she refused to show me the unoccupied apartments. Therefore,

762.   **POLICE:**  How many unoccupied are there?

763.   **DEFENDANT SORVINO:**  Well that's what's interesting.

764.   **POLICE:**  How apartments total in this building?

765.   **PLAINTIFF:** Nine

766.   **POLICE:** OK.

767.   **DEFENDANT SORVINO:** She told me that there were only five rentals, but my due diligence yesterday showed me there are more than five rentals; and that is the issue that I am presently having.  It's my duty, which I have to do pursuant to Court Order investigate these apartments.  I have not bothered any tenants. (Handing a document to the Police).

768.   **PLAINTIFF:** YES.  She has actually.

769.   **POLICE:**  Yes. But this is not a Court order.

770.   **DEFENDANT SORVINO: Yes it is.**

771.   **POLICE:  <u>Where is the Judges signature?</u>**

772.   **DEFENDANT SORVINO:** Because of Covid the Judges are not…

773.   **PLAINTIFF:** That's the whole point.  Because of Covid.  None of this should be happening. In addition, in addition…

774.   **POLICE:**  What's your name?

775.   **PLAINTIFF:** My name is Kim Mortimer,

776.   **POLICE:**  Kim? OK.

777.   **PLAINTIFF:**  P.O. Police Officer Furgeson.  I am the owner of the property.

778.   **POLICE:** You've been displaced?

779.   **PLAINTIFF:** NO.  I am the **owner** of the property.

780.   **POLICE: OK.**

781.   **PLAINTIFF:** I have been displaced of management, as Ms. Sorvino has said.

782.   **POLICE: OK.**

783.   **PLAINTIFF:** She has been appointed as the Trustee.  She came yesterday to distribute the notices.  I allowed her to come in and I said I could not expose my tenants of the possibility of this Covid.  She insisted.  She threatened me and said if she didn't have the access then she was going to break the locks on the door.  I was like you have the management, financial management.  **You are not...  Management does not mean ownership!**

784.   **DEFENDANT SORVINO:** Management does mean ownership in bankruptcy court.

785.   **DEFENDANT SORVINO:**  Yes, in bankruptcy court it does. (Sorvino in the background trying to distract the police with her continued interruption and chatter)

786.   **PLAINTIFF:** No it does not.  No it does not.

787.   **POLICE:**  Well that's something that can be argued in court.  We're not going to argue about that here.

788.   **DEFENDANT SORVINO:** Yes. It is.  We don't need to argue about it.

789.   **PLAINTIFF:** The bottom line is...I I I can I not speak?  You asked me to  I said to Ms. Sorvino, I would be accommodating for her

790.   **DEFENDANT GRODSKY:**  Just let us look in the apartment and we're get out of here.

791. **DEFENDANT GRODSKY:** (Unintelligible)

792. **PLAINTIFF:** I said to Ms. Sorvino, I would be accommodating to her. It was this corrupt lender. OK. That I had issues with. OK?

793. **PLAINTIFF:** Can I not speak

794. **PLAINTIFF:** The bottom line is...According to the Moratorium, nobody should be doing anything right now. OK?

795. **DEFENDANT SORVINO:** Not true really.

796. **DEFENDANT SORVINO:** I don't care really.

797. **POLICE:** So what does the court say? Did the Court say that she could enter?

798. **DEFENDANT SORVINO:** Yes. Yes.

799. **PLAINTIFF:** Well no. No. The Court says that she has management.

800. **POLICE:** How many apartments does she need to go through and look at to determine if there is anything that needs to be done.

801. **DEFENDANT SORVINO:** You have my attorney card. Are you going to take a picture of it.

802. **PLAINTIFF:** Well. Like I said. here are 5 occupied apartments.

803. **POLICE:** Occupied. OK.

804. **PLAINTIFF:** I told her there are four remaining unoccupied and I said that yesterday.

805. **POLICE:** So the four are unoccupied.

806. **PLAINTIFF:** The four are unoccupied. I never got an email. I just came in. I just came in actually. I saw her and Mr. Grodsky

807. **DEFENDANT SORVINO:** I called and emailed her.

808. **PLAINTIFF:** She might have, but I saw that they were coming to break locks which is illegal. Because my ownership has not been rescinded.

809.   **DEFENDANT SORVINO:**  It has pursuant to the order of the Court

810.   **PLAINTIFF:** No it hasn't.  that's not what it said.

811.   **POLICE:** Ok. But If she has documentation that says

812.   **PLAINTIFF:** She has **no** documentation, that's the point. The documentation says according to that letter (unsigned), that she is the manager, **not** ownership. It's very clear. Alright, and I said, I would be willing to show Ms. Sorvino, because I have been accommodating, I have tried to be accommodating, but I cannot allow her to (1) disrupt my tenants (2) be aggressive and threaten me.

813.   **POLICE:** What does she have.  You're not claiming to kick them out

814.   **PLAINTIFF:** She did.  This all happened yesterday.  Yes.  She did that.  She did that.

815.   **DEFENDANT SORVINO:** You don't have to allow me. You don't have to Stop telling me what you can allow me.

816.   **PLAINTIFF:** Yes, I can.  You have issues.  I still own the property, and the bottom line is that she is saying I am not cooperative.  I was very cooperative because I let her in the building to do what she needed to do.  However, the lender and she came and break locks which is illegal. Because, my ownership has not been rescinded.

817.   **DEFENDANT SORVINO:**  Yes it has.

818.   **PLAINTIFF**: No it hasn't.

819.   **POLICE:** If she has documentation

820.   **POLICE:** She has not documentation.

821.   **PLAINTIFF**: That's the point!  The documentation says. According to that letter she is the manager.  NOT ownership.  OK.  It is very clear.  And I said.  I would be willing to show Ms. Sorvino, because I have been trying to be accommodating, but I **cannot** allow her to (1) disrupt my tenants (2) be aggressive and threatened me.

822.   **POLICE:** You're not planning to kick them out?

823.   **PLAINTIFF:** No no no no no.

824.   **PLAINTIFF:** I am speaking to the Officer right now.  As I said.  I am OK with showing her, what she needs to show.  This man

825.   **DEFENDANT SORVINO:** He's the lender.  He's the one who owns the mortgage on the building that's in default.  He already has a foreclosure judgment against the building.

826.   **PLAINTIFF:**  <u>Which is on appeal.  Which is on appeal, and</u>

827.   **POLICE:** Let her finish.

828.   **DEFENDANT SORVINO:** I have been doing this for 31 years.

829.   **PLAINTIFF:** OK.

830.   **DEFENDANT SORVINO:** He filed as his right as the lender.

831.   You have a foreclosure action.  He filed a foreclosure action.  He got a foreclosure judgement against the building.

832.   **POLICE:** Right

833.   **DEFENDANT SORVINO:** and she then filed for bankruptcy of the building which is a common tactic Then, because of what happened in the bankruptcy, Judge Chapman a Federal Bankruptcy Judge, they take bankruptcy lawyers who have been practicing a long time.

834.   **PLAINTIFF:** That is true.  That is correct.

835.   **DEFENDANT SORVINO:** I was appointed, you can look me up.  I can show all of you my attorney card again.  I am on every list there is to be on.

836.   **PLAINTIFF:** That's not the point though.

837.   **DEFENDANT SORVINO:** He is the lender.  He as the right as the lender to get access to the building, because he is essentially funding in the bankruptcy.

838.   **POLICE:** Alright. Sorry to cut you off…so essentially what you're trying to do is…

839.   **DEFENDANT SORVINO:** Sorry. Let me back up for one second. As the CH. 11 Trustee, it's liken to a State Court Receiver, where I have to come in and check what's going on, check who is in apartments, is there an illegal Air BNB going on. Is there a VRBO going on. So. I knocked on every apartment yesterday. I asked her nicely, can I please have keys to the front door.

840.   **POLICE:** How many out of the five did you make contact with? How many out of the five did you make contact with?

841.   **PLAINTIFF:** Five.

842.   **DEFENDANT SORVINO:** No. I only made contact with four, but based on rent checks and the leases, I compared everything I believe there are 6 tenants, and she has only reported to the Courts there are five...

843.   **PLAINTIFF:** Wrong.

844.   **POLICE:** So. Is there one apartment? Is there one apartment getting split?

845.   **DEFENDANT GRODSKY:** Well we just need to get into the vacant ones.

846.   **DEFENDANT SORVINO:** ...Why don't the leases and the checks match up?

847.   **POLICE:** Umm humm.

848.   **PLAINTIFF:** As I said...

849.   **GRODSKY:** We just need to search the vacant apartments then we're out of here.

850.   **DEFENDANT SORVINO:** So I have that problem. I also need to report to the Court if there are unoccupied apartments, what's going on, are there illegal tenants here.

the record, there should be five.

851.   **POLICE OFFICER:** What can we cops do for you today?

852.   **DEFENDANT SORVINO:** I wasn't going to bother you guys. She called because she is the owner, but I am the Court receiver was allowed...

853.   **PLAINTIFF:** No. I called because I am the owner.  First of all Receivership **does not** mean ownership.  It means management as per the letter. in finances.

854.   **POLICE OFFICER:**  Whatever that dispute is?  Right now my question to you is are you willing to let her in and observe the apartments.  That's my question.

855.   **PLAINTIFF:** First of all.  As I said… receivership does not mean ownership, as per that letter.

856.   **POLICE:**  Are you willing to let her in right now   Out of the four, will you let her in yes or no?

857.   **PLAINTIFF:** She can. He cannot.  No.  She I will show even though you did not tell me you'd be coming to do that. I will show Ms. Sorvino, so she can do her job.  He cannot see.

858.   **DEFENDANT SORVINO:**  You guys must know I am entitled to keys.  I am the Chapter 11 Trustee. She does not.

859.   **PLAINTIFF:** I am sorry that is not happening.  That's not going to happen. No no no.  She can say anything she wants.

860.   **DEFENDANT SORVINO:**  You thank I would lose my license

861.   **PLAINTIFF:** You might just lose it. OK. Alright.  Well no.  Like I said.  I am willing to show her.

862.   **POLICE:** The four apartments.

863.   **PLAINTIFF:** If she needs to see the four

864.   **DEFENDANT SORVINO:**  I need to see everything.   Yes. The Lender is funding this whole procedure.  The lender is actually very corrupt.

865.   **DEFENDANT GRODSKY:** She is going to lose the building in the next 60 days anyway.

866.   **DEFENDANT SORVINO:** You signed mortgage papers.

867.   **PLAINTIFF:** They were bated and switched.

868.   **DEFENDANT SORVINO:** Oh my God.  Oh my God.

869.   **POLICE:**  We are not going to argue about this.

870.   **DEFENDANT GRODSKY:** Open the door, I just want to look inside.  I just want to see if they are rented, occupied.  I just want to see what is going on in the rooms.

871.   **PLAINTIFF:** No. OK.  I said

872.   **POLICE:** We are not going to argue about this.

873.   **PLAINTIFF:** I am not going to argue about this, but she is saying that something is happening which is not.

874.   **DEFENDANT SORVINO:** He is the lender, I am the CH. 11 Trustee, I have the right to bring the lender in so…

875.   **PLAINTIFF:** As I said.  You never notified me.

876.   **DEFENDANT SORVINO:** You really have not idea about bankruptcy code.  I don't have to notify you.

877.   **PLAINTIFF:** Like I said.  Like I said. And that's not going to happen.

878.   **DEFENDANT SORVINO:** This is why I need to change the locks.

879.   **POLICE:**  Show her the unoccupied apartments, since you don't believe her.

880.   **PLAINTIFF:** No No. She is the CH. 11 Trustee.  That is not the issue. OK. I said.

881.   **DEFENDANT GRODSKY:** I will stand behind her.  That's all.

882.   **PLAINTIFF:** He can leave.

883.   **POLICE:** Said to do that.

884.   **DEFENDANT SORVINO:** How?

885.   **PLAINTIFF:** Actually, Actually,

886.   **DEFENDANT GRODSKY:**  She has a court order.

887. **PLAINTIFF:** She **does not** have a Court Order. She has an order as the Trustee. It does not say that she has the right to break any locks.

888. **DEFENDANT SORVINO:** What do you think a State Court Receiver does? I am even above the State Court Receiver.

889. **PLAINTIFF:** No. No. They do not have the right to do that without a Court Order. He can leave.

890. **DEFENDANT SORVINO:** Oh my God. I have been practicing for 31 years. Yes. They do. Yes. They do. I am just doing my job.

891. **POLICE OFFICER:** OK. He will not enter the apartment, but he will just follow her.

892. **DEFENDANT SORVINO:** But that's exactly what you're doing.

893. **PLAINTIFF:** Because as I said. It has been appealed.

894. **POLICE:** did you get the approval for the appeal?

895. **PLAINTIFF:** Well I wouldn't know.

896. **DEFENDANT SORVINO:** We can stand here and call Judge Chapman. She will not be happy. We have four officers here wasting their time.

897. **POLICE:** She has a Court Order.

898. **DEFENDANT SORVINO:** You have no paperwork for a stay. Really?

899. **PLAINTIFF:** I did not say I have a stay. An appeal has been filed in District Court.

900. **POLICE:** In a nutshell, he is here with the Trustee. There is nothing that says she is not allowed to bring other personnel.

901. **PLAINTIFF:** And there is nothing that says that she can break the locks either.

902. **POLICE:** She is the manager. So again, if you would just simply just show her

903. **PLAINTIFF:** And again as I said, I was willing to show her. Him I am not.

904.   **PLAINTIFF:** So you're officer Fergerson #15633, Officer Paulkett 15093, Lt. Bowls,

Officer Richardson.

905.   **DEFENDANT GRODSKY:** Drill the lock.  I mean…

906.   **DEFENDANT SORVINO:**  I really tried to handle this without getting you guys

(referring to the POLICE OFFICERS) involved.

907.   **POLICE:** They are going to drill the locks

908.   **PLAINTIFF:** Whatever you are going to do.  Uh. I am not going to open it.

909.   **DEFENDANT GRODSKY:**  You are not going to open the door.

910.   **POLICE:**     So you guys do whatever you have to do then.

911.   **DEFENDANT GRODSKY:** You are not going to open give us the keys?

912.   **PLAINTIFF:** No.

913.   **DEFENDANT SORVINO:**  Do you guys need for me to do something for

the record.

914.   **POLICE:** No. I have it all on my bodycam.

915.   **DEFENDANT GRODSKY:** Yes, but but. Would an officer be willing to stay here cause

I am a little suspicious as to why… What I am saying if something is hiding behind the door, if

someone is that reluctant to turn the key and let us in, I am a little concerned as to what might be

in those units.

916.   **PLAINTIFF:** No no.  There is nothing

behind the door.

917.   **POLICE:** OK. So why are you complaining?  Just unlock the door.

918.   **PLAINTIFF:** Um.  Because like I said – I

would let her see it.

919.   **POLICE:** Alright, we're gonna be forced to babysit you the entire time…

920.   **PLAINTIFF:** Well that's up to you.

That's up to you.

921.   **POLICE:** Alright. Let's go.  We'll just walk room to room.

922.   **DEFENDANT GRODSKY:** You are not opening the doors or are we opening the

doors?

923.   **POLICE:** No. You are going to drill the locks and I am going to stay here with you.

924.   **DEFENDANT GRODSKY:** You're going to watch us drill the locks?

925.   **PLAINTIFF:** Aha. Let's go.

926.   **DEFENDANT GRODSKY:** No.

927.   **DEFENDANT SORVINO:** So, you're not going to give me access and

you're not going to give me the keys.

928.   **PLAINTIFF:** I told you I was going to give you access, but he, (secured creditor 2386

Hempstead Inc's president Scott Grodsky) cannot come in.  So you want to do that?

929.   **CH. 11 TRUSTEE HEIDI J SORVINO:** I need keys to the apartments that are

unoccupied.  I need keys to the front door.

930.   **PLAINTIFF:**  As I said, I am not giving that. As I said…

931.   **DEFENDANT SORVINO:** And you are denying me access in front of all

these officers. Unbelievable.

932.   **PLAINTIFF:** As I said, that is not

Let's go.

933.   **GRODSKY:** Drill the lock!

934.   **PLAINTIFF:** Uh, you guys do what you  have to do. I am not going to

open the door.  So, you guys do what you have to do.

935.   **DEFENDANT GRODSKY** You're not going to open the door? Are you going to open

the door or not?  Is she going to give you keys to the front door?

936.   **CH. 11 TRUSTEE HEIDI J SORVINO:** NO.

937.   **DEFENDANT GRODSKY:**  Now we have to do all the front door locks

938.   **DEFENDANT SORVINO:** Now I have to do the front door locks.

939.   **POLICE:** Why would you do that?

940.   **PLAINTIFF:** If that's what you do. I  don't want you to do it but I have

rights. Because I have a right and I don't feel that. This is still my property and I am still the

owner...

941.   **POLICE:** Well, if it's up for sale...

942.   **PLAINTIFF:** Well I didn't put it up for sale. OK.  As I said.  That is

943.   **DEFENDANT GRODSKY:** Is she going to give you the keys to the front door?

944.   **CH. 11 TRUSTEE HEIDI J SORVINO:** No.

945.   **DEFENDANT GRODSKY:** Then we will have to drill the front door locks too.

946.   **DEFENDANT SORVINO:**  I want access to this apartment.

947.   **POLICE:** Will you please open the door for her?

948.   **PLAINTIFF:** Well if he (Defendant Grodsky) going to stay downstairs

949.   then I will.

950.   **DEFENDANT SORVINO:**  Let's go. I need access!

951.   **PLAINTIFF:** And as I said I would be willing to give you access but Mr. Grodsky will have to remain downstairs.

952.   **DEFENDANT SORVINO:** It's not up to you.  I keep trying to explain this to you.

953.   **PLAINTIFF:** I am trying to work with you.   I am willing to show you.

954.   **DEFENDANT SORVINO**: No you are not.

955.   **PLAINTIFF:** Yes. I am.

956.   **DEFENDANT SORVINO**: Two days now, I come to Manhattan.

957.   **PLAINTIFF:** You did not tell me you were coming today.

958.   **CH. 11 TRUSTEE HEIDI J SORVINO:** Because you wouldn't give me access yesterday.

959.   **PLAINTIFF:** You did not tell me you were coming today.

960.   **DEFENDANT SORVINO:** You are really not trying to work with me.

961.   **POLICE: (unintelligible)**

962.   **DEFENDANT SORVINO:** Yes. Yes.

963.   **PLAINTIFF:** Well yes. I am and I have been.

964.   **POLICE:** Mam. Can you just open the door?

965.   **DEFENDANT SORVINO:** Yes, yes- I'll have him wait downstairs

966.   **POLICE:** Right now it will be us four.  He'll (Grodsky) will wait downstairs.

967.   **DEFENDANT SORVINO:** (SHOUTING) SCOTT? SCOTT? JUST STAY DOWNSTAIRS FOR NOW!

968.   **DEFENDANT GRODSKY:** Can you do me a favor and Facetime me?

969.   **DEFENDANT SORVINO:** Yes.

970.   **PLAINTIFF:** OK Wait.  I have to get the  keys.

971.   **POLICE:** OK.

972.   **DEFENDANT SORVINO:** All the things going on in the City, you guys
have to do this.

973.   **DEFENDANT GRODSKY**: We. We were already here yesterday trying to get access.

974.   **PLAINTIFF:** But you didn't actually contact me today.

975.   **POLICE:** Don't make this confrontational.

976.   **PLAINTIFF:** He (Secured Creditor 2386 Hempstead Inc's President
Scott Grodsky) was very confrontational yesterday.  What is the name of your locksmith because
he might have to…

977.   **DEFENDANT GRODSKY**:  (TO OTHER POLICE OFFICERS) Just wait here in case
she changes her mind. I don't know.  Just wait here OK?  In case she changes her mind or does
something, I don't know.

**(Exiting the building).**

978.   **PLAINTIFF:** What is the name of your locksmith?

979.   **DEFENDANT SORVINO:** Stop with your nonsense, the name of the locksmith…

980.   **PLAINTIFF:** I need the name of the locksmith because he messed the
lock up and now I can't open this door.

981.   **POLICE:** You'll get everybody's names

982.   **DEFENDANT SORVINO:** You can't open the door now?

983.   **PLAINTIFF:** I have the keys, but if I can't open the door. He might have

to change it anyway.  He drilled the hole in there.

984.   **PLAINTIFF:** No, I have the keys, but I

can't open the door, because he drilled and damaged the lock, he might have to change it

985.   **DEFENDANT SORVINO:** Scott.  Scott. Did he drill a hole in there?

986.   **DEFENDANT GRODSKY**: What?

987.   **DEFENDANT SORVINO:** Did he drill the hole that I can't get in now?  Scott?

988.   **DEFENDANT GRODSKY**: What?

989.   **DEFENDANT SORVINO:** Did he drill the hole that I can't get in now?

990.   **DEFENDANT GRODSKY:** Probably.

991.   **PLAINTIFF:** Well I can't get into that one.

992.   **POLICE:** Alright then, let's go to the next one.

993.   **PLAINTIFF:** Here.  Do you want to try?

994.   **DEFENDANT SORVINO:** NO. I don't want to try.  You just said you

can't get in.

995.   **PLAINTIFF:** I can't get in

996.   **DEFENDANT SORVINO:** OK. Let's go to the next one.

997.   **POLICE:** OK. Let's go to the next one.  He's (referring to the Scott Grodsky's

locksmith) going to take this lock out because it's broken anyway so.

998.   **PLAINTIFF:** You can wait until I finish.  OK.

999.   **DEFENDANT SORVINO:** OK. Can I get in please?

1000.  **POLICE:** Thank you for opening the doors for us. OK?

1001. **PLAINTIFF:** Uh huh. Satisfied?

1002. **DEFENDANT SORVINO:** NOPE!

1003. **PLAINTIFF:** Too bad!

1004. **DEFENDANT SORVINO:** Come again?

1005. **PLAINTIFF:** I said it's too bad!

1006. **POLICE:** Up again?

1007. **PLAINTIFF:** Yeah yeah yeah last one!

1008. **(SOUNDS OF DRILLING IN THE BACKGROUND).**

1009. **DEFENDANT SORVINO:** Sorry. Just…

1010. **POLICE:** I am assuming that one is occupied over there?

1011. **DEFENDANT SORVINO:** So that's two.  This is two.  Isn't this the one you normally

call 5 or no?

1012. **PLAINTIFF:** Can we get outside now.  Are you finished?  So those are

the ones that are unoccupied.

1013. **DEFENDANT SORVINO:** So this is seven.

1014. **POLICE:** Yep

1015. **(MORE SOUNDS OF DRILLING IN THE BACKGROUND).**

1016. **DEFENDANT SORVINO:** This is seven

1017. **PLAINTIFF:** That's all there are.

1018. **DEFENDANT SORVINO:** Six, four, two, four, seven…

1019. **PLAINTIFF:** (Directed at locksmith):  You're going to replace that lock

right?

1020.   **(LOCKSMITH):** Sure. Yeah yeah.

1021.   **PLAINTIFF:** Excuse me.  You didn't see  this one.  Did you do this one too?

1022.   **PLAINTIFF:** Here you go…

1023.   **POLICE:** Mam?

1024.   **DEFENDANT SORVINO:** Yes.  I put them under the door yesterday. So you know.

1025.   **POLICE:** She said there were 4 unoccupied.

1026.   **PLAINTIFF:** No.  There are three.  I am in one of them.

1027.   **POLICE:** So can she see the one that you're in?

1028.   **PLAINTIFF:** No because I am occupying it. It's my private property.  It doesn't matter. It's my private property.

1029.   **POLICE:** Just listen to me.  She (**DEFENDANT SORVINO**) said she has a right and access to the building, the Front door.  And she said she has a right to drill it.  That going to be a civil matter.  It's not going to be a police matter.  OK?

1030.   **PLAINTIFF:** Then she (**DEFENDANT SORVINO**) needs to provide me with that document(s) because she doesn't not have that document.

1031.   **POLICE:** You're going to have take that up with your lawyer.  But it won't be a police matter.

1032.   **DEFENDANT SORVINO:** You showed me Unit 4, Yet there is a lease for  a…That's apartment was a mess.

1033.   **PLAINTIFF:** Can we leave now?

1034.   **DEFENDANT SORVINO:** That is what I am asking right now.

1035.  **POLICE:** I am just trying.

1036.  **PLAINTIFF:** No.  I will not.  Because as I said.

1037.  **DEFENDANT GRODSKY:** Then we have to drill it off.

1038.  **POLICE:** It's not going to be a police matter.

1039.  **PLAINTIFF:** (addressing the locksmith):  Can you replace that?

1040.  **LOCKSMITH:** It needs to be replaced.

1041.  **PLAINTIFF:** Yes. I know.  I am just going to replace it back.

1042.  **CH. 11 TRUSTEE HEIDI J SORVINO:** Replace it back?

1043.  **PLAINTIFF:** That is right.

1044.  **DEFENDANT GRODSKY:** Just give her the keys

1045.  **PLAINTIFF:** I am not giving her the keys.

1046.  **DEFENDANT SORVINO:** Once we replace the locks, she just said she is  going to replace them back.

1047.  **DEFENDANT GRODSKY:** Listen, I don't care.

1048.  **DEFENDANT SORVINO:**  What I am going to have to do is go to  Court. Now we have it on the police recording. I am not spending the Lender's money to Change these locks because I have the Police report and she just admitted and I have

1049.  **DEFENDANT GRODSKY:** It's going to be an awful lot of work these locks.

1050.  **PLAINTIFF:** I have a recording too.

1051.  **CH. 11 TRUSTEE HEIDI J SORVINO:** I am really not worried about it.

1052.  **PLAINTIFF:** I am not either.

1053.   **POLICE:** Get the judge to write that you have access to change the locks or drill the locks and when you come here if she tries to stop you, you can have her arrested

1054.   **DEFENDANT GRODSKY**: Exactly.

1055.   **DEFENDANT SORVINO:** Got it.

1056.   **PLAINTIFF:** Exactly.

1057.   **POLICE: OK.** That's that.  You need a paper trail.  You say realtors need access to this.

1058.   **DEFENDANT SORVINO:** Yes.  Realtors are going to need access.

1059.   **POLICE:** Yep.  The realtors need access, the name of the realtors.  You say realtors need access to this.

1060.   **DEFENDANT GRODSKY**: Then she'll be arrested.

1061.   **PLAINTIFF:** Well yeah.

1062.   **PLAINTIFF:** (To locksmith). You need to replace the lock.

1063.   **LOCKSMITH:** I am not working for free.  If you would like me to pay me – I will replace the lock.

1064.   **POLICE:** You need a paper trail.

1065.   **PLAINTIFF:** Thank you sir.

1066.   **POLICE:** You're welcome mam.

1067.   **DEFENDANT SORVINO:** I am just asking again, you're not going to give me the keys…

1068.   The problem with these events is that Defendant Sorvino made fraudulent statements to the Police Officers stating that she had Judge Chapman's authority to come to private property, along with Defendant Grodsky and locksmith to drill off locks and search the premises.

1069.   However, on May 12th 2020 neither Defendant Sorvino nor the Defendant Grodsky or locksmith had an **Order** from Judge Chapman to drill off locks and search the vacant premises of the property.

1070.   Notably. The Police Sgt. stated that the document that Ms. Sorvino showed him had not yet been endorsed by Judge Chapman.

1071.   Defendant Sorvino was appointed as CH. 11 Trustee April 28th 2020.

1072.   On May 12th 2020 Defendant Sorvino along with Defendant Grodsky came to the Plaintiff property without a search warrant and/or order from the Bankruptcy Court. Defendants Grodsky and Sorvino started drilling of locks from the property in order to gain access to the units.  The Second circuit has held that "a private actor acts under color of law when the private actor "is a willful participant in joint activity with the State or its agents." *Ciambrello v City of Nassau, 292 F.3d 307, 324 (2d Cir.2002)*,

1073.   Judge Chapman's Order compelling the Plaintiff to turn-over the estate was signed on May 21st 2020 *expos factos* of the May 11th 2020 and May 12th incidents. 2020 incidents.

1074.   **NY Penal Law § 145.00: Criminal Mischief in the Fourth Degree**

Criminal mischief is one of several crimes in New York Penal Law that is designed to punish those who damage the property of another person. If you damage someone else's property without the permission of the property's owner, you would have committed criminal mischief.

Criminal mischief is commonly referred to as vandalism. There are four criminal mischief offenses in the New York criminal code.

1075.   Plaintiff had/has the right to be secure in her persons, property, house, papers, and effects, against unreasonable searches and seizures.

1076.   Plaintiff's privacy rights were violated.

1077.   Plaintiff's due process rights were violated as a result of this action.

1078.   Plaintiff repeats that she does not feel secure on her persons, house and effects as she has for fear of retaliation for exercising her First Amendment Right to free speech.

1079.   Since Defendants Sorvino, Grodsky or John Doe 1 Locksmith hadn't an order or a warrant. Defendant Sorvino, Grodsky or John Doe 1 Locksmith violated Plaintiff's, 4th Amendment Constitutional Right, and committed the crime of Criminal Mischief.


## AS AND FOR A FIRST CAUSE OF ACT AGAINST DEFENDANTS
### Violations of GBF Section 349

1080.   Plaintiff repeats and realleges paragraph 1 through 1079 as if fully set forth herein.

1081.   Defendants through its principals misleed Plaintiff in a material way by making representation that the mortaage documentation she agreed to guarantee was the same when when it was not.

1082.   Plaintiff is entitled to an accurate accounting of all monies which were disbursed at the 2014, 2015, 2016 closings.

1083.   By reason of the foregoing, plaintiff has suffered and will continue to suffer damages in an amount of four million dollars, or to be determined at trial, but that in any event is not less than one million four hundred thousand ($1,400,000) plus interest thereon.

## AS AND FOR A SECOND CAUSE OF ACT AGAINST DEFENDANT(S)
## IMPLIED COVENANT OF GOOD FAITH AND FAIR BUSINESS DEALINGS

1084.   Plaintiff repeats and realleges each and every allegation contained in paragraph 1-1079 as if fully set forth herein

1085.   The above referenced Defendants represented and agreed duty and covenant of good faith and fair dealings.

1086.   By reason of the foregoing, Plaintiff has suffered and will continue to suffer damages in an amount to be determined at trial.

## THIRD CAUSE OF ACT AGAINST DEFENDANTS
## Fraud and Misrepresentation

1087.   Plaintiff repeats and realleges each and every allegation contained in paragraph 1- 1079 as if fully set forth herein

1088.   Defendants induced Plaintiff to retain and guarantee the loan to Plaintiff by representing to Plaintiff that it intended to perform in good faith fair and equitable business practices.

1089.   Defendants' representation were false at the time they were made, and defendants intentionally made the representation knowing they were false.

1090.   Defendants had no intention to fully and substantially comply with the Plaintiffs requests of providing a fair accounting of escrowed funds

1091.   The foregoing constituted material misrepresentation that plaintiff relied upon to its detriment causing financial injury to Plaintiff.

1092.   As a remedy for fraud and misrepresentation, jointly and severally against the Defendants, Plaintiff is entitle to its out-of-pocket loss in the sum of $500,000, plus interest thereon, together with punitive damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACT AGAINST DEFENDANTS MARK SCHLUSSLE AND

## ZEICHNER, ELLMAN AND KRAUS (UNJUST ENRICHMENT)

1093.  Plaintiff repeats and realleges each and every allegation contained in paragraph 1- 1079 as if fully set forth herein

1094.  Defendant Schlussel and Defendant Zeichner, Ellman and Kraus LLP violated the Attorney–client privilege when he disclosed the confidential communications and information that was given to him by Plaintiff's brother Sedgwick Mortimer made "full and frank" disclosures regarding separate real estate legal matter.

1095.  Instead he used the privileged and confidential information to take an adversarial role against the Plaintiff's by representing the Defendants Horneff's and then enriching himself by representing the adversary of the plaintiff.

1096.  Because Plaintiff ultimately satisfied the debt via a refinance, Zeichner Ellman and Kraus demanded and was paid legal fee in the sum of $185,4732.

1097.  As a result of Defendants Schlussel and Zeichner Ellman and Kraus LLP Plaintiff was been damaged in the sum of $185,4732 Dollars.

1098.  Additionally, Zeichner Ellman and Kraus calculated 17% as an interest rate as opposed to the agreed upon 16%.

1099.  Plaintiff is entitled to a judgement against Defendants to be determined at trial.

## FIFTH CAUSE OF ACT AGAINST DEFENDANTS
## (FRAUDULENT ENDUCEMENT)

1100.  Plaintiff repeats and realleges each and every allegation contained in paragraph 1- 1079 as if fully set forth herein

1101.   "Fraudulent inducement may be based on oral statements.  See, *Danann Realty Corp. v. Harris,* 5 NY2d 317, 320 [1959] ("Where the complaint states a cause of action for fraud, the parole evidence rule is not a bar to showing the fraud either in the inducement or in the execution despite an omnibus statement that the written instrument embodies the whole agreement, or that no representation have been made.")." "Here there is no merger clause or no representation clause in the written agreements.  Moreover, the oral (and written albeit unsigned), misreprentation were specifically alleged by Plaintiff."

1102.   Despite preparing and submitting fraudulent documents to the courts, defendants have refused to refund the money they have been holding in escrow for the plaintiff.

## SIXTH CAUSE OF ACT AGAINST DEFENDANTS
### Punitive Damages

1103.   Plaintiff repeats and realleges each and every allegation contained in paragraph 1- 1079 as if fully set forth herein

1104.   Defendants have intentionally disrupted plaintiff's ability to continue its operation of the cooperative building by stealing its money via a Fraud for Profit Scheme.

1105.   It is necessary and proper to punish defendant for such egregious conduct and to deter defendants or any other lenders and real estate professionals who might consider similar conduct in the future.

1106.   Plaintiff was harmed by the they of the funds and fraudulent activities of the defendants in an amount that extends beyond the loss of money, her property,  including the need to pay for professionals to investigate and to provide legal representation and forensic accounting.

1107.  Accordingly, punitive damages should be awarded against the defendants, jointly and severally.

### FIRST CLAIM
### 42 U.S.C. § 1983

1.  Plaintiff repeat and re- allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

2.  Defendants, by their conduct toward Plaintiff alleged herein, violated Plaintiffs' rights guaranteed by 42 U.S.C. § 1983 and the First, Fourth, Fifth and Sixth and Fourteenth Amendments to the Constitution of the United States.

3.  Defendants' unlawful actions, which were committed under color of law were done willfully, knowingly and with malice and with the specific intient to deprive Plaintiffs of their constitutional rights.

4.  As a direct and proximate result of Defendants' unlawful conducts, Plaintiffs sustained the damages hereinbefore alleged.

5.  PUT ELSEWHERE. "[Section 1983] creates no substantive rights; it merely provides remedies for deprivation of rights established elsewhere" *City of Okla, Cit v. Tuttle* 471 U.S. 808, 816 (1985).  To state any claim under section 1983, a plaintiff must allege two elements: "[i] the defendant acted under color of law; and [ii] as a result of the defendant's actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutionals or privileges" *Annis v Cit of Westchester*, 136 F.3d 239, 245 2d Cir. 1998).

6.  Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

7.     by their conduct toward Plaintiffs alleged herein, violated Plaintiffs' rights guaranteed by 42 U.S.C. § 1983 and the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States.

## SECOND CLAIM
## SUBSTANTIVE DUE PROCESS

8.     Plaintiff repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

9.     Plaintiffs' right to privacy on the facts described herein were unduly violated.

10.     As described herein, Defendants' false statements and objectively unreasonable actions violated Plaintiff's clearly established privacy, property rights.

11.     Defendants' unlawful actions, which were committed under color of law, were done willfully, knowingly with malice and with the specific intent to deprive Plaintiffs of her constitutional rights.

12.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs sustained the damages herein alleged.

## THIRD CLAIM
## PROCEDURAL DUE PROCESS

13.     Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

14.     Plaintiffs suffered the deprivation of her rights as described herein.

15.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs sustained the damages herein alleged.

## FOURTH CLAIM
## UNREASONABLE SEARCH AND SEIZURE

16.     Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

17.     Defendants violated the Fourth and Fourteenth Amendments because they came to the premises without a warrant on May 11th and 12th 2020 and drilled locks off of Plaintiffs' private property.

18.     Defendants also violated these amendments relative to their violation of Plaintiff's Privacy Rights.

19.     Defendants also violated these amendments relative to their unreasonable and unlawful searches of Plaintiff' home and other property despite Plaintiffs' expectation of privacy in that property and without a warrant.

20.     Defendants' unlawful actions, which were committed under the color of state law were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of her constitutional rights.

21.     Defendants also violated these amendments relative to their unreasonable and unlawful searches of Plaintiffs' home and other property despite Plaitniffs' expectation of privacy in that property and without a warrant.

22.     Defendant Sorvino repeatedly told Plaintiff that she was allowed to conduct the above referenced action(s) because she was the Court Appointed Chapter 11 Trustee.

23.     Defendants' unlawful actions, which were committed under color of law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of her constitutional rights.

24.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## FIFTH CLAIM
## MALICIOUS PROSECUTION

25. Plaintiff repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

26. Defendants violated the Fourth and Fourteenth Amendments because they initiated and continued

27. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.


## SIXTH CLAIM
## DENIAL OF RIGHT TO FAIR TRIAL CLAIM, FABRICATION OF EVIDENCE

28. Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

29. As herein described, Defendants intentionally fabricated evidence and made false statements against Plaintiffs in the context of the bankruptcy proceedings thus depriving her of the right to a fair trial proceeding..

30. Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiffs of their Constitutional Rights.

31. Defendants' unlawful actions, which were committed under color of stgate law, were done willfully, knowingly, with malice and with the specific intednt to deprive Plaintiff of her Constitutional Rights.

32. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs sustained the damages hereinbefore alleged.

## SIXTH CLAIM
## MALICIOUS ABUSE OF PROCESS/POWER

33.     Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

34.     As herein described, Defendants intentionally made use of regularly issued civil process with an intent to do harm without excuse or justification, and this was done in a perverted manner in order to obtain a collateral objective.

35.     As a consequence, Plaintiffs suffered a subsequent interference with their persons and property.

36.     Defendants' unlawful actions, which were committed under color of law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiffs of their constitutional rights.

37.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs sustained the damages hereinbefore alleged.


## SEVENTH CLAIM
## FIRST AMENDMENT RETALIATION

38.     Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

39.     At times, Defendants White and Williams, Sorvino, Grodsky and 2386 Hempstead Inc. committed misconduct in response to Plaintiff's speech insisting that Defendants demonstrate that they followed due process before seeking to infringe upon her rights.

40.     Defendants' unlawful actions, which were committed under color of law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiffs of their constitutional rights.

## EIGHTH CLAIM
## FAILURE TO INTERVENE

41.     Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

42.     The Defendant Sorvino actively participated in the aforementioned unlawful conduct and observed such conduct, had an opportunity to prevent such conduct, had a duty to intervene and prevent such conduct and failed to intervene.

43.     Accordingly, the Defendant Sorvino who failed to intervene violated the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

44.     Defendant Sorvino' unlawful actions, which were committed under color of law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiffs' Constitutional Rights.

45.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs sustained the damages hereinbefore alleged.

## NINTH  CLAIM
## MONELL

46.     Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

47.     Defendants, collectively and individually, while acting under color of law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the United States Constitution.

48.     Plaintiff believes (1) Sorvino acted under the color of law, and (2) as a result of the Defendants Actions, the Plaintiff suffered a denial of her federal statutory rights and her constitutional right and privileges.

**PRAYER FOR RELIEF WHEREFORE**, Plaintiffs respectfully seeks a temporary injunction of any sales, marketing, or auction of the property in the Bankruptcy Proceedings. Plaintiff respectfully request that the Court hear Plaintiff' State-Law Claims against 2386 Hempstead Inc.

Plaintiff asserts that her motion for injunction relief should be granted on the grounds for the Defendants underlying foreclosure action violated the Plaintiffs constitutional rights; were predicated on fraud and without merit.; respectfully seeks that the referee's faulty and unsubstantiated computations, computed on default and without a hearing, be accurately recalculated. Plaintiffs respectfully seeks an injunction of sanctions that are currently being levied upon her in Bankruptcy Court as they violate and have violated the Plaintiff Civil, Statutory and Constitutional rights; if not totally eviscerate the loan because of fraud, recalculate the amount due for the loan minus the interest of 25%.;  entering judgment for Plaintiffs against Defendants on each of their claims for relief;  1. Awards to Plaintiffs for compensatory damages against all Defendants, jointly and severally, for their violation of Plaintiffs' First, Fourth, Fifth, Sixth and Fourteenth Amendment rights, the amount to be determined at jury trial, which Plaintiffs respectfully demands pursuant to FRCP 38;

2. Awards to Plaintiffs of punitive damages against Defendants on the basis of their conscious wrongdoing and callous indifference to Plaintiffs' constitutional rights and welfare, the amount to be determined at jury trial, which Plaintiffs respectfully demands pursuant to FRCP 38.

3. Stay all actions until a proper forensic accounting has been conducted and it is ascertained the total amount actual fees, costs and charges that the Plaintiff has been defrauded of.

4. Determine whether or not the mortgage and note should be rescinded.

Respectfully

Kim Mortimer
60 West 91st Street
New York, New York 10024
Kimmortimer5@gmail.com

## **AFFIDAVIT**

STATE OF NEW YORK

COUNTY OF NEW YORK

KIM MORTIMER, being duly sworn, deposes and says that I am acquainted with the facts and circumstances of the above-entitled proceedings, that I have read the foregoing Complaint and knows the contents thereof; the same is true to her own knowledge except as to those matters therein stated to be alleged upon information and belief and that so to matters I believe it to be true.  I declare under penalty of perjury that the foregoing is true and correct.

_____

                                                                KIM MORTIMER

114

...nsore...
...nca Rodriquez
V. 91ST STREET
NY 10024



Pro-Se Intake Unit
United States District Court
Southern District of New York
500 Pearl Street
NYC, NY 10027

RE: New Complaint

